1  Victor A. Sahn (CA Bar No. 97299)
      vsahn@sulmeyerlaw.com
2  Mark S. Horoupian (CA Bar No. 175373)
      mhoroupian@sulmeyerlaw.com
3  **Sulmeyer**Kupetz
   A Professional Corporation
4  333 South Hope Street, Thirty-Fifth Floor
   Los Angeles, California 90071-1406
5  Telephone: 213.626.2311
   Facsimile: 213.629.4520
6
   Attorneys for David Schwartzman, Debtor
7  and Debtor in Possession

8
                 **UNITED STATES BANKRUPTCY COURT**
9
       **CENTRAL DISTRICT OF CALIFORNIA, SAN FERNANDO VALLEY DIVISION**
10

11 In re                                    Case No. 1:09-bk-16565-MT
12 DAVID SCHWARTZMAN,                        Chapter 11
13        Debtor.                            **DEBTOR'S DISCLOSURE STATEMENT**
14                                           **DESCRIBING DEBTOR'S CHAPTER 11**
                                             **PLAN OF REORGANIZATION**
15                                           <u>**Disclosure Statement Hearing**</u>
16
17                                           DATE:    [To be set]
                                             TIME:    [To be set]
18                                           PLACE:   Courtroom 302
                                                      21041 Burbank Boulevard
19                                                    Woodland Hills, CA 91367-6603
20                                           <u>**Plan Confirmation Hearing**</u>
21                                           [To be set]
22                                           *{See Disclosure Statement for Voting and*
                                             *Objection Procedures}*
23
24
25
26
27
28

[MSH\LIT\529827.1]

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 2

    A.    Purpose of this Document ............................................................... 4

    B.    Deadlines for Voting and Objecting: Date of Plan Confirmation
        Hearing ............................................................................................ 5

    C.    Disclaimer ....................................................................................... 6

II. DEFINITIONS, INTERPRETATIONS AND RULES OF CONSTRUCTION .................. 6

    A.    Definitions ........................................................................................ 6

    B.    Interpretations, Computation of Time and Governing Law ............ 13

III. BACKGROUND ...................................................................................................... 14

    A.    Brief Summary of Dates and Circumstances that Led Debtor to File
        Bankruptcy .................................................................................... 14

    B.    Assets of the Debtor ..................................................................... 17

    C.    Liabilities ....................................................................................... 35

    D.    Events Occurring After Bankruptcy Filing .................................... 41

IV. SUMMARY OF PLAN ............................................................................................. 42

    A.    What Creditors and Interest Holders will Receive Under the Plan ............ 42

    B.    Unclassified Claims ...................................................................... 42

    C.    Classified Claims And Interests .................................................... 45

    D.    Means of Effectuating the Plan ..................................................... 53

    E.    Risk Factors .................................................................................. 58

    F.    Other Provisions of the Plan ......................................................... 62

    G.    Tax Consequences of the Plan ..................................................... 64

V. CONFIRMATION REQUIREMENTS AND PROCEDURES ....................................... 66

    A.    Who May Vote Or Object .............................................................. 67

    B.    Liquidation Analysis ...................................................................... 69

    C.    Feasibility ...................................................................................... 72

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  VI. EFFECT OF CONFIRMATION OF PLAN...................................................................73

2      A.    Discharge .................................................................................................73

3      B.    Revesting Of Property In The Reorganized Debtor ...................................74

4      C.    Default........................................................................................................74

5      D.    Modification Of Plan ..................................................................................74

6      E.    Post-Confirmation Status Report ..............................................................75

7      F.    Post-Confirmation Conversion/Dismissal .................................................75

8      G.    Post-Confirmation U.S. Trustee Fees........................................................76

9      H.    Final Decree ...............................................................................................76

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SulmeyerKupetz**, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

I.

**INTRODUCTION**

David Schwartzman is the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Case").  On June 1, 2009 (the "Petition Date"), the Debtor commenced the Case by filing a voluntary chapter 11 petition under the United States Bankruptcy Code (the "Bankruptcy Code"), 11 U.S.C. § 101, *et seq.*  The Debtor continues to operate its business and manage its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Case.

Chapter 11 allows the Debtor, the creditors and others parties in interest to propose a plan of reorganization.  A plan of reorganization may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.  The Debtor is the party proposing the Debtor's chapter 11 Plan of Reorganization (the "Plan") sent to you in the same envelope as this document. **THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT (the "Disclosure Statement") DESCRIBING THE PLAN.**  The Disclosure Statement is provided to help you understand the Plan.  All terms which are not otherwise defined in the Plan shall have the same meaning as such terms are provided in this Disclosure Statement.

The Plan is a reorganizing plan.  Simply put, the Debtor seeks to accomplish payments under the Plan by using profits from operations to fund the Plan. The effective date of the Plan (the "Effective Date") will be the first business day which is at least eleven (11) days following the date of entry of the Court order confirming the Plan (the "Plan Confirmation Order") when and provided that all of the following conditions to the effectiveness of the Plan have been satisfied or waived by the Debtor:  (a) there shall not be any stay in effect with respect to the Plan Confirmation Order; (b) the Plan Confirmation Order shall not be subject to any appeal or rehearing; and (c) the Plan and all documents, instruments and agreements to be executed in connection with the Plan

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    shall have been executed and delivered by all parties to such documents, instruments

2    and agreements.  The Debtor following the Effective Date shall be referred to as the

3    "Reorganized Debtor."

4         The Plan contemplates (among other things) a reorganization of the

5    Debtor's affairs with the following structures:

6         ▪ Creditors holding Secured Claims against the Debtor shall retain,

7              unaltered, all of their legal, equitable and contractual rights, and

8              consequently, shall be deemed to vote in favor of the Plan.

9         ▪ Creditors holding Allowed Priority Claims against the Debtor shall

10             receive payment in full under the terms of the Plan.

11        ▪ Creditors holding certain Allowed Unsecured Claim against the

12             Debtor shall receive payment on account of their obligation from the

13             Plan Fund established on the Effective Date.  The Plan Fund shall be

14             funded from the net profits from the continued operation of the

15             Debtor's businesses, and particularly, its development or disposal of

16             certain real estate projects.   The Debtor projects that creditors will

17             be paid in full in this regard.

18        ▪ The Ziegler Family Trust, the Debtor's largest unsecured creditor will

19             receive payments over time from the operation of the Debtor's real

20             estate development business.

21        ▪ The Debtor shall retain his ownership assets in the Estate, subject to

22             the obligations created by or preserved under the Plan.

23        The Debtor has carefully examined and analyzed the profitability of the

24   continuation of the affairs of DS Ventures, LLC and DMB Ventures, LLC, and has

25   determined that the continuation of the projects is critical to the success of his

26   reorganization, and is in the best interest of all creditors. The continuation of the business

27   of the Debtor will serve not only to create the profits which will be used to satisfy Allowed

28   Unsecured Claims, but will eliminate substantially those claims that are based upon the

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   Debtor's personal guaranty of underlying debt obligations of the various projects.  The

2   Debtor projects that the continuation of his business ventures will result in more than

3   sufficient funds to satisfy all Allowed General Unsecured Claims.  The Debtor will infuse

4   approximately $100,000 a month from his available cash on hand to cover the overhead

5   expenses of DS Ventures, as necessary.  The amount necessary to fund the operations

6   will decrease as certain projects begin creating revenue, and/or additional sources of

7   funding are implemented.

8   A.      **Purpose of this Document**

9           This Disclosure Statement summarizes what is in the Plan, and tells you

10   certain information relating to the Plan and the process the Court follows in determining

11   whether or not to confirm the Plan.

12           **READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO**

13   **KNOW ABOUT:**

14           **(1)      WHO CAN VOTE OR OBJECT;**

15           **(2)      WHAT THE TREATMENT OF YOUR CLAIM IS (*i.e.*, what your**

16   **claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT**

17   **COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

18           **(3)      THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS**

19   **DURING THE BANKRUPTCY;**

20           **(4)      WHAT THINGS THE COURT WILL LOOK AT TO DECIDE**

21   **WHETHER OR NOT TO CONFIRM THE PLAN;**

22           **(5)      WHAT IS THE EFFECT OF CONFIRMATION; AND**

23           **(6)      WHETHER THE PLAN IS FEASIBLE.**

24           This Disclosure Statement cannot tell you everything about your rights.

25   You should consider consulting your own lawyer to obtain more specific advice on how

26   the Plan will affect you and what is the best course of action for you.

27           Be sure to read the Plan as well as this Disclosure Statement.  If there are

28   any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  will govern.  The Bankruptcy Code requires a Disclosure Statement to contain "adequate

2  information" concerning the Plan.  The Bankruptcy Court has approved this document as

3  an adequate Disclosure Statement, containing enough information to enable parties

4  affected by the Plan to make an informed judgment about the Plan.

5  **B.**      **Deadlines for Voting and Objecting: Date of Plan Confirmation Hearing**

6           **THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN**

7  **THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN**

8  **ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER**

9  **CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND**

10  **ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.**

11           1.      Time and Place of the Confirmation Hearing

12           The hearing where the Court will determine whether or not to confirm the

13  Plan will take place on _____, 2009 at _____ ___.m., in Courtroom 302 of

14  the United States Bankruptcy Court, located at 21041 Burbank Boulevard, Woodland

15  Hills, California 91367.

16           2.      Deadline for Voting for or Against the Plan

17           If you are entitled to vote, it is in your best interest to timely vote on the

18  enclosed ballot and return the ballot in the enclosed envelope to Victor A. Sahn, Esq.,

19  **Sulmeyer**Kupetz, 333 South Hope Street, Thirty-Fifth Floor, Los Angeles, California

20  90071.  Your ballot must be received by 5:00 p.m., Pacific Daylight Savings Time, on

21  _____, 2009 or it will not be counted.

22           3.      Deadline for Objecting to the Confirmation of the Plan

23           Objections to the confirmation of the Plan must be filed with the Court on

24  _____, 2009 and served by same day service upon Victor A. Sahn, Esq.,

25  **Sulmeyer**Kupetz, 333 South Hope Street, Thirty-Fifth Floor, Los Angeles, California

26  90071, fax:  (213)629-4520; email:  vsahn@sulmeyerlaw.com.

27           4.      Identity of Person to Contact for More Information Regarding the

28  Plan

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Any interested party desiring further information about the Plan should

2    contact Victor A. Sahn, Esq., **Sulmeyer**Kupetz, 333 South Hope Street, Thirty-Fifth Floor,

3    Los Angeles, California 90071, telephone: (213) 626-2311, email:

4    vsahn@sulmeyerlaw.com.

5    **C.    Disclaimer**

6    The financial data relied upon in formulating the Plan is based on the

7    Debtor's books and records which, unless otherwise indicated, are unaudited; appraisals

8    of the real property owned by the Debtor; and financial projections prepared by the

9    Debtor.  The information contained in this Disclosure Statement is provided by the

10    Debtor.  The Debtor represents that everything stated in this Disclosure Statement is true

11    to the Debtor's best knowledge.  The Bankruptcy Court has not yet determined whether

12    or not the Plan is confirmable and makes no recommendation as to whether or not you

13    should support or oppose the Plan.

14    II.

15    **DEFINITIONS, INTERPRETATIONS AND RULES OF CONSTRUCTION**

16    **A.    Definitions**

17    1.    **"Administrative Claim"** means a Claim for costs and expenses of

18    the administration of the bankruptcy case under sections 503(b) or 507(b) of the

19    Bankruptcy Code, including, without limitation:  (a) the actual and necessary costs and

20    expenses incurred after the Petition Date of preserving the Estate and operating the

21    business of the Debtor (such as wages, salaries, or commissions for services); (b) all

22    Claims of professionals employed at the expense of the Estate; and (c) any fees or

23    charges assessed against the Estate under 28 U.S.C. § 1930.

24    2.    **"Allowed Administrative Claim"** means an Administrative Claim

25    allowed pursuant to sections 503(b) or 507(b) of the Bankruptcy Code.

26    2.1    **"Allowed Claim"** means a Claim:  (a) with respect to which a

27    Proof of Claim has not been filed but the Claim has been listed in the Schedules filed with

28    the Bankruptcy Court by the Debtor and not listed as disputed, contingent, or unliquidated

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  as to amount and as to which no objection is filed within the time period fixed by the

2  Bankruptcy Court, or as to which any such objection has been determined by a Final

3  Order; or (b) with respect to which a Proof of Claim has been filed within the time period

4  fixed by the Bankruptcy Court, and as to which no objection is filed within the time period

5  fixed by the Bankruptcy Court, or as to which any such objection has been determined by

6  a Final Order.

7  2.2  **"Allowed General Unsecured Claim"** means an unsecured

8  Allowed Claim against the Debtor, however arising, not entitled to priority under section

9  507(a) of the Bankruptcy Code, including, without limitation, an Allowed Claim based on

10  the rejection of an executory contract or unexpired lease, an Allowed Claim arising under

11  section 502(h) of the Bankruptcy Code, or the unsecured or deficiency portion of any

12  Allowed Secured Claim.

13  2.3  **"Allowed Priority Claim"** means an Allowed Administrative

14  Claim, Allowed Priority Tax Claim, or Allowed Priority Unsecured Claim.

15  2.4  **"Allowed Priority Tax Claim"** means an Allowed Claim

16  entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

17  2.5 **"Allowed Priority Unsecured Claim"** means an Allowed Claim

18  entitled to priority pursuant to sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or

19  507(a)(7) of the Bankruptcy Code.

20  2.6 **"Allowed Secured Claim"** means an Allowed Claim secured by

21  a valid, perfected and enforceable lien that is not subject to avoidance under bankruptcy

22  or non-bankruptcy law, equal to the lesser of: (a) the Allowed amount of such Claim; or

23  (b) the value, as determined by the Bankruptcy Court pursuant to sections 506(a) and

24  1129(b) of the Bankruptcy Code and Bankruptcy Rule 3012, of: (i) the interest of the

25  holder of such Claim in the property of the Debtor securing such Claim, or (ii) the amount

26  subject to setoff under section 553 of the Bankruptcy Code. To the extent provided for

27  under section 506(b) of the Bankruptcy Code, an Allowed Secured Claim shall also

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  include interest on such Claim, and any reasonable fees, costs or charges provided for

2  under the agreement or the State statue under which such Claim arose.

3  2.7 **"Avoidance Action"** means any action which is filed or which

4  may be filed pursuant to the provisions of sections 510, 542, 543, 544, 545, 547, 548,

5  549, or 550 of the Bankruptcy Code, any actions based on applicable nonbankruptcy law

6  that may be incorporated or brought under the foregoing sections of the Bankruptcy

7  Code, or any other similar action or proceeding filed to recover property for or on behalf

8  of the Estate or to avoid a lien or transfer.

9  2.8 **"Avoidance Action Proceeds"** means all of the Cash proceeds

10  recovered from Avoidance Actions.

11  2.9 **"Ballot"** means the form distributed to Claimants on which is to

12  be stated an acceptance or rejection of the Plan.

13  2.10 **"Bankruptcy Code"** or **"Code"** means title 11 of the United

14  States Code, as now in effect or hereafter amended, and as applicable to the Debtor's

15  bankruptcy case.  All citations in the Plan to section numbers are to the Bankruptcy Code

16  unless otherwise expressly indicated.

17  2.11 **"Bankruptcy Court"** or **"Court"** means the United States

18  Bankruptcy Court for the Central District of California, San Fernando Valley Division,

19  which has jurisdiction over this bankruptcy case and the Estate of the Debtor, or such

20  successor court or tribunal as may hereafter be confirmed or created by lawful authority

21  with power to confirm reorganization plans under chapter 11 of the Bankruptcy Code and

22  all applicable statutes, rules, and regulations pertaining thereto.

23  2.12 **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy

24  Procedure and the Local Bankruptcy Rules for use in the Bankruptcy Court, as now in

25  effect or hereafter amended, and as applicable to the Debtor's bankruptcy case.

26  2.13 **"Bar Date"** means the last date for filing Proofs of Claim other

27  than Administrative Claims or Claims based upon the rejection of any executory contracts

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  or unexpired leases, or claims arising under section 502(h) of the Bankruptcy Code. The

2  Bar Date for filing Proofs of Claim has not yet been set.

3  2.14 **"Business Day"** means any day other than a Saturday,

4  Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a).

5  2.15 **"Cash"** means cash and cash equivalents, including, but not

6  limited to, checks or similar forms of payment or exchange.

7  2.16 **"Claim"** means:  (a) a right to payment from the Debtor,

8  whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

9  contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or

10  unsecured; or (b) a right to an equitable remedy for breach of performance if such breach

11  gives rise to a right to payment from the Debtor, whether or not such right to an equitable

12  remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

13  unmatured, disputed, undisputed, secured, or unsecured.

14  2.16 **"Claimant"** means the holder of a Claim.

15  2.17 **"Class"** means a grouping into which Claims which are

16  substantially similar to other Claims have been classified pursuant to Article IV of the

17  Plan.

18  2.18 **"Confirmation"** means the entry of the Confirmation Order by

19  the Bankruptcy Court.

20  2.19 **"Confirmation Date"** means the date on which the

21  Confirmation Order is entered by the Bankruptcy Court.

22  2.20 **"Confirmation Hearing"** means the hearing, including any

23  continued or postponed session thereof, at which time the Bankruptcy Court will consider

24  and determine whether to confirm the Plan.

25  2.21 **"Confirmation Order"** means the order, as entered, of the

26  Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

27  2.22 **"Creditor"** means the holder of an Allowed Claim.

28  2.23 **"Debtor"** means David Schwartzman.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    2.24 **"Disallowed Claim"** means:  (a) a Claim against the Debtor,

2    which Claim is disallowed pursuant to an order of the Bankruptcy Court as to which

3    eleven calendar days have passed following entry of such order and no stay pending an

4    appeal of such order is obtained during such period; (b) a Claim with respect to which a

5    Proof of Claim has not been filed but the Claim has been listed in the Schedules filed with

6    the Bankruptcy Court by the Debtor and not listed as disputed, contingent, or unliquidated

7    as to amount.

8    2.25 **"Disclosure Statement"** means this Disclosure Statement

9    (and all exhibits or schedules annexed thereto or referenced therein) which accompanies

10    the Plan, as the Disclosure Statement may be amended, modified, or supplemented from

11    time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

12    2.26 **"Disputed Claim"** means any Claim:  as to which the Debtor,

13    or any other party in interest, has interposed a timely objection or request for estimation

14    or subordination in accordance with the Bankruptcy Code and the Bankruptcy Rules,

15    which objection or request for estimation or subordination has not been withdrawn or

16    determined by a Final Order.  A Claim will be considered a Disputed Claim in its entirety if

17    an objection is timely filed to any portion of such Claim.

18    2.27 **"Disputed Claims Reserve Fund"** means the fund created

19    upon the Effective Date consisting of funds available for Distribution on account of

20    Disputed Claims.

21    2.28 **"Distribution"** means the Cash which is required to be

22    distributed under the Plan to the holders of Allowed Claims.

23    2.29 **"Effective Date"** means the date not later than thirty days (30)

24    following the date upon which the Confirmation Order becomes a Final Order; provided,

25    however, that, if an appeal of the Confirmation Order is timely filed, the Debtor may elect

26    to cause the Plan to become effective, notwithstanding the pendency of such appeal, so

27    long as no stay of the Confirmation Order is in effect, by filing with the Bankruptcy Court a

28    notice of such election, in which event the Plan will become effective as provided herein.

1    In any case, the Debtor shall serve written notice that the Plan has become effective on

2    all Creditors and Parties in Interest.

3    2.30 **"Estate"** means the estate created under section 541 of the

4    Bankruptcy Code in this bankruptcy case.

5    2.31 **"File," "Filed" or "Filing"** means filed with the Bankruptcy

6    Court having jurisdiction over this bankruptcy case.

7    2.32 **"Final Distribution"** means, for each Class, the last

8    Distribution to be made to holders of Allowed Claims in that Class.

9    2.33 **"Final Order"** means an order or judgment of the Bankruptcy

10   Court, or of any court of competent jurisdiction where there is pending an action in which

11   the Debtor are a party, which has not been reversed, stayed, modified, or amended, and

12   as to which:  (a) the time to appeal, petition for certiorari, or move for reargument or

13   rehearing has expired and as to which no appeal, petition for certiorari, or other

14   proceeding for reargument or rehearing shall then be pending; (b) any right to appeal,

15   petition for certiorari, reargument, or rehearing shall have been waived in writing in form

16   and substance satisfactory to the Debtor; or (c) any appeal, petition for certiorari,

17   reargument or rehearing has been resolved by the highest court to which the order or

18   judgment was appealed timely or from which certiorari, reargument, or rehearing was

19   sought.

20   2.34 **"General Unsecured Claim"** means an unsecured Claim

21   against the Debtor that is not entitled to priority under section 507(a) of the Bankruptcy

22   Code, including, without limitation, a Claim based on the rejection of an executory

23   contract or unexpired lease.

24   2.35 **"Petition Date"** means June 1, 2009, the date on which the

25   Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code.

26   2.36 **"Plan"** means the Debtor's chapter 11 Plan, as the Plan may

27   be amended, modified, or supplemented from time to time in accordance with the

28   Bankruptcy Code and Bankruptcy Rules.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    2.37 **"Post-Confirmation Estate Claims"** means any and all claims

2  and causes of action which constitute property of the Estate including, but not limited to,

3  any Avoidance Actions, whether or not such claims or causes of action are the subject of

4  litigation pending as of the Effective Date.

5    2.38 **"Priority Claim"** means an Administrative Claim, Priority Tax

6  Claim, or Priority Unsecured Claim.

7    2.39 **"Priority Tax Claim"** means a Claim asserted to have priority

8  under section 507(a)(8) of the Bankruptcy Code.

9    2.40 **"Priority Unsecured Claim"** means a Claim asserted to have

10  priority under sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the

11  Bankruptcy Code.

12    2.41 **"Professionals"** means professionals such as attorneys,

13  consultants or accountants employed at the expense of the Bankruptcy Estate.

14    2.42 **"Proof of Claim"** means a statement under oath filed in this

15  bankruptcy case by a Claimant in which the Claimant sets forth the amount claimed to be

16  owed to it and sufficient detail to identify the basis for the Claim, in accordance with

17  Federal Rule of Bankruptcy Procedure 3001.

18    2.43 **"Reorganized Debtor"** means the Debtor herein, on or after

19  the Effective Date.

20    2.44 **"Secured Claim"** means a Claim secured by a lien, security

21  interest or other charge against property in which the Estate has an interest, or which is

22  subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value,

23  determined in accordance with section 506(a) of the Bankruptcy Code, of the interest of

24  the holder of such Secured Claim in the Estate's interest in such property, or to the extent

25  of the amount subject to any setoff, as the case may be.

26    2.45 **"Unclaimed Distribution"** means any Distribution which is

27  unclaimed as a result of any of the following:  (a) checks which have been returned as

28  undeliverable without a proper forwarding address; (b) checks which were not mailed or

1  delivered because of the absence of a proper address to which to mail or deliver the

2  same; (c) checks which remain unnegotiated for a period of ninety days after the date of

3  issuance.

4  **B.    Interpretations, Computation of Time and Governing Law**

5          1.    Undefined Terms

6                Any term used in the Disclosure Statement that is not defined in the

7  Disclosure Statement, either in Section II.A (Definitions) or elsewhere, but that is used in

8  the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in

9  the Bankruptcy Code or the Bankruptcy Rules.

10         2.    Rules of Interpretation

11               For the purposes of the Disclosure Statement:

12               (a)    Whenever, from the context, it is appropriate, each term,

13  whether stated in the singular or the plural, shall include both the singular and the plural.

14               (b)    Any reference in the Plan to a contract, instrument, release or

15  other agreement or document being in a particular form or on particular terms and

16  conditions means that such document shall be substantially in such form or substantially

17  on such terms and conditions.

18               (c)    Any reference in the Plan to an existing document or Exhibit

19  Filed or to be Filed means such document or Exhibit, as it may have been or may be

20  amended, modified, or supplemented as of the Confirmation Date.

21               (d)    Unless otherwise specified in a particular reference in the

22  Plan, all references in the Plan to Sections, Articles or Exhibits are references to

23  Sections, Articles and Exhibits of or to the Plan.

24               (e)    Unless otherwise specified in a particular reference in the

25  Plan, the words "herein," "hereof," "hereto," "hereunder," and others of similar import

26  refer to the Plan in its entirety rather than only to a particular paragraph, subparagraph, or

27  clause contained in the Plan.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1        (f)     Captions and headings to Articles and Sections are inserted

2 for convenience of reference only and are not intended to be a part of or to affect the

3 interpretation of the Plan.

4        (g)     The provisions of the Plan will control over any description

5 thereof contained in the Disclosure Statement.

6        (h)     Any term used in the Plan that is not defined in the Plan, but

7 that is used in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning

8 assigned to that term in (and shall be construed in accordance with the rules of

9 construction under) the Bankruptcy Code or the Bankruptcy Rules.  Without limiting the

10 foregoing, the rules of construction set forth in section 102 of the Bankruptcy Code shall

11 apply hereto.  The definitions and rules of construction contained herein do not apply to

12 the Disclosure Statement or to the exhibits to the Plan except to the extent expressly so

13 stated in the Disclosure Statement or in each exhibit to the Plan.

14        (i)     Except to the extent that federal law, including the Bankruptcy

15 Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the

16 Plan shall be governed by, and construed and enforced for all purposes in accordance

17 with, the laws of the State of California, without giving effect to any principles of conflict of

18 laws thereof.

19        (j)     All exhibits to the Plan are incorporated into the Plan and will

20 be deemed to be included in the Plan, regardless of when they are filed.

21        3.     <u>Computing Time Periods</u>

22        In computing any period of time prescribed or allowed by the Plan, the

23 provisions of Bankruptcy Rule 9006(a) shall apply.

24        III.

25        **BACKGROUND**

26 A.    **Brief Summary of Dates and Circumstances that Led Debtor to File**

27 **Bankruptcy**

28        1.     The Debtor's Business

[MSH\LIT\529827.1]        14

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    Various financial concerns and conditions led to the filing of the Debtor's

2   bankruptcy and the bankruptcies of the San Feliciano and Riverfront entities.  These

3   include, but are not limited to, several major events.  First, Lehman Brothers ("Lehman")

4   was DS Ventures' and DMB Ventures' primary financial partner and source of equity on

5   approximately 20 real estate projects.  Pursuant to the agreement of DS Ventures, DMB

6   Ventures and Lehman, Lehman was to fund 90% of the capital needs for each project

7   with DS Ventures or DMB Ventures funding the remaining 10%.  Lehman experienced its

8   well-publicized financial collapse which resulted in its filing for protection under

9   chapter 11 in September 2008.  Lehman was contractually obligated to provide significant

10  capital to the businesses of the Debtor which would have been used to fund the

11  completion of the entitlements for, and construction on, the various properties.

12    Following the commencement of the Lehman bankruptcy case the funding

13  for all projects involving DS Ventures and DMB Ventures ceased.  Thereafter, significant

14  operating capital was provided to DS Ventures and DMB Ventures by the Debtor

15  personally as the managing member of DS Ventures DMB Ventures.  Based up the

16  continuing decline in the California real estate market and various other matters,

17  discussed below, the Debtor soon realized that his personal resources would be

18  insufficient to fund the development and carry costs of all projects while at the same time

19  expending substantial funds to defend the litigation directed at him personally based

20  upon various guarantees given in connection with loans for projects in which DS

21  Ventures and/or DMB Ventures has an interest.

22    On June 1, 2009 the Debtor filed a petition under Chapter 11 of the U.S.

23  Bankruptcy Code as Case Number 1:09-bk-16565 which case is pending before this

24  Court.   On June 1, 2009 San Feliciano filed a petition under Chapter 11 of the U.S.

25  Bankruptcy Code as Case Number 1:09-bk-16563 which case is pending before this

26  Court (the "San Feliciano Bankruptcy").  On July 13, 2009 Riverfront filed a petition under

27  Chapter 11 of the U.S. Bankruptcy Code as Case Number 1:09-bk-18832 which case is

28  pending before this Court (the "Riverfront Bankruptcy"). The San Feliciano Bankruptcy

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  and the Riverfront Bankruptcy was necessitated, in part, by the fact that the lender on the

2  San Feliciano and Riverfront Properties, Central Pacific Bank ("Central Pacific"), ceased

3  funding under the loans secured by the San Feliciano and Riverfront Properties

4          The Debtor is the guarantor of three Central Pacific loans for three projects

5  in which DS or DMB have an interest, including the San Feliciano and Riverfront

6  Properties.  Central Pacific commenced an action in California state court to enforce

7  these guarantees.  In connection with this action Central Pacific sought and was granted

8  a prejudgment writ of attachment against the Debtor, and other non-debtor parties.  The

9  Debtor, San Feliciano and other Debtor-related entities had vigorously opposed the

10  prejudgement writ, however, it was granted over this opposition.  This  precipitated the

11  filing of the Debtor's bankruptcy case.

12          Various financial concerns and conditions led to the filing of the Debtor's

13  and the San Feliciano and Riverfront bankruptcies.  These include, but are not limited to,

14  the following:

15          a.      The Writ of Attachment obtained by Central Pacific;

16          b.      The non-judicial foreclosure proceeding commenced by

17  Central Pacific relating to the San Feliciano and Riverfront Properties;

18          c.      The Notices of Default recorded against various properties in

19  which the Debtor has an interest through DS Ventures and DMB Ventures and for he has

20  executed loan guarantees;

21          d.      The financial collapse of Lehman which was the primary

22  source of equity for DS Ventures and DMB Ventures on approximately twenty (20)

23  projects.   The collapse resulted in Lehman's failure to honors its capital funding

24  commitments which were substantial.  The problems with Lehman's funding initially

25  began in the spring of 2008.  Thereafter, Lehman's funding performance worsened and

26  was followed by its  collapse and bankruptcy.  Pursuant to the agreement of DS Ventures

27  and DMB Ventures with Lehman, Lehman was to fund ninety percent (90%) of the capital

28  needs for each project with DS Ventures or DMB Ventures, as applicable, funding the

1  remaining ten percent (10%).  Thus, based upon his guarantees to various lenders and

2  his interests in DS Ventures and DMB Ventures, the Debtor was required to personally

3  fund the necessary capital for the projects.  Lehman's decline and financial collapse was

4  the single most important factor in the decline of the various entities in which the Debtor

5  (and DS Ventures and DMB Ventures) was involved, even more so than the decline in

6  the California real estate market and the constriction of the capital markets;

7          e.  The general decline of the real estate markets in Southern

8  and Central California; and

9          f.  The virtual freeze of the capital markets in the throughout

10  California, the United States and the world.

11  **B.**  **Assets of the Debtor**

12          The Debtor's assets are best described in two separate categories, his

13  general non-business related assets, and the assets relating to his ownership interests in

14  various real estate ventures.

15          1.  General Assets:

16          a.  <u>Personal Residence</u>:  The Debtor resides in the single family

17  home located at 1426 Harridge Drive, Beverly Hills, California 90210 (the "Residence").

18  The Residence consists of 5,671 square feet and a guest house consisting of 444 square

19  feet located on a 12,127 square foot lot.  The Residence was acquired in June 2002 for a

20  purchase price of $2,125,000.  The property is encumbered by a first trust deed securing

21  a note in the amount of $2,238,288, a second trust deed securing a note in the amount of

22  $420,000 and a third trust deed securing a note in the amount of $512,500.  The

23  Residence was appraised for $3,385,000 in October 2002.  The present fair market value

24  of the Residence is $6,500,000 resulting in equity of approximately $3,329,212.

25          b.  <u>Household Goods</u> – The Debtor owns household goods and

26  furnishings which are located at his Residence and which have a liquidation value of

27  $60,000.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    c.    Books, Pictures and Other Art – The Debtor owns books,

2    pictures and other art and collectibles located at his Residence which have a liquidation

3    value of $30,000.

4    d.    Wearing Apparel – The Debtor owns wearing apparel which

5    has a liquidation value of $30,000.

6    e.    Jewelry – The Debtor owns certain jewelry which has a

7    liquidation value of $7,500.

8    f.    Cash – The Debtor has cash on hand in the amount of

9    approximately $600.00.

10    g.    Checking, Savings and Other Financial Accounts – The

11    Debtor has the sums in checking, savings or other financial accounts, certificates of

12    deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead

13    associations, or credit unions, brokerage houses, or cooperatives as are set forth in

14    attached Exhibit "1."

15    h.    Insurance Policies – The Debtor has an interest in that certain

16    Hartford Life Insurance Company Last Survivor Variable Life Policy on the life of his

17    mother, Suzanne Schwartzman, having an account value of $139,806.

18    i.    Stock Ownership in Businesses – All of the issued and

19    outstanding shares in Patriot Homes, LLC, a California corporation ("Patriot"), are owned

20    by the Debtor.  Patriot was formerly engaged in the business of real estate investment,

21    development, and home construction and acted as the management entity for the various

22    projects in which Debtor was involved in developing.  The majority of the projects in

23    which Patriot was involved were single-family home tract projects located in and around

24    Fresno, California.  Patriot is no longer actively engaged in business or operational.

25    However, Patriot still exists as a legal entity and will file a tax return for 2008.  As of June

26    15, 2009, Patriot no longer had any employees.  Patriot wound down its business

27    operations because of the declining California real estate market combined with the fact

28

1   that the projects in Fresno and Clovis, California in which it was involved had been

2   completed.  No new projects were commenced that required the involvement of Patriot.

3          j.    Automobile – The Debtor is the owner of that certain 2006

4   Bentley Continental automobile. The outstanding balance on the debt used to acquire the

5   automobile is approximately **$57,000**.  The automobile has been listed on

6   AutoTrader.com for sale at a price of $110,000. However, the Debtor made the decision

7   to trade the automobile in on a less expensive automobile without waiting for a sale to be

8   accomplished via AutoTrader.com or similar method and the same will be accomplished

9   on or before October 22, 2009.

10         k.    Office Equipment – The Debtor owns certain office equipment,

11  furnishings and supplies used in and located at his place of business and at his

12  Residence having a value of approximately $5,000.

13         l.    Tax Refund –   The Debtor recently prepared and will submit

14  his 2008 Federal tax return, and is expecting a tax refund of approximately $1,230,000.

15         m.    Litigation Claims:

16         2.    Lehman Brothers:

17         a.    As described herein, the Debtor has asserted claims against

18  Lehman Brothers, and has filed proofs of claim in its bankruptcy case for over

19  $40,000,0000.  A copy of the Debtor's proof of claim is attached hereto as Exhibit 2.

20  DVS has also filed a proof of claim against Lehman in the amount of $3.5 million, a true

21  and correct copy of which is attached hereto as Exhibit 3.

22         3.    Central Pacific Bank:

23         a.    Disputes arose between the Bank, the borrowers and the

24  Debtor relating to the San Feliciano, Clovis and Riverfront properties. The Bank filed suit

25  in Los Angeles Superior Court against the Trust, the Debtor and Master 1 on their

26  guarantees.  A cross-complaint was filed against the Bank alleging lender liability causes

27  of action.  The Bank sought and obtained a prejudgment writ of attachment against the

28  Trust, Schwartzman and Master 1.  The Bank filed a complaint in Fresno for judicial

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  foreclosure and for the appointment of a receiver with regard to Clovis.  They sought to

2  have the receiver appointed on an ex parte basis.  The matter was heard originally on

3  April 23, 2009.  The court took the matter under submission and ordered a further hearing

4  scheduled for April 28, 2009.  At this hearing the court denied the ex parte relief based on

5  the failure to show irreparable harm and the matter was set for further hearing on May 21,

6  2009.  However, such relief was granted after a further hearing.  Subsequently a problem

7  was discovered in the Bank's documentation relating to its collateral.  The Bank seeks to

8  remedy such problem through in the state court by way of an amended complaint to

9  which a demurrer has been filed.

10          4.      GE Financial

11                  a.      LB/L-DS Ventures Metropolitan II, LLC, a Delaware limited

12  liability company ("Borrower") is the owner of that real property located in Hollywood,

13  California (the "Project").  Merrill Lynch Capital ("Merrill") was the original lender on the

14  Project.  On or about August 2, 2007, Merrill loaned Borrower the sum of $40,510,344

15  (the "Loan").  The Loan was evidenced by a note executed in favor of Merrill and secured

16  by deed of trust on the Project.

17                  GE Business Financial Services, Inc., a Delaware corporation

18  ("Lender") acquired Merrill's interest in the Loan. The Loan is currently scheduled to

19  mature on August 31, 2010. The outstanding principal balance of the Loan is

20  $32,098,059.47 and $8,412,284.53 remains available for funding.  The last funding of a

21  draw by Lender occurred on September 4, 2008.

22                  The Lender recorded a notice of default against the property on April

23  15, 2009.  A complaint alleging lender liability has been filed against GE.  The parties

24  have been having discussions regarding the resolution of this matter.

25                  b.      Miscellaneous Assets – The Debtor also has an interest in

26  four model homes located in Clovis, California which are the subject of a co-ownership

27  and holding agreement.  The current value of these homes is unknown.

28          5.      Partnerships/Limited Liability Companies:

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

[MSH\LIT\529827.1]                    20

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   DS Ventures, LLC ("DS Ventures") is a California limited liability company

2   through which David Schwartzman ("Debtor") conducts his real estate investment and

3   development business.  Debtor is the Managing Member of DS Ventures and holds an

4   86% membership interest in the company.  The other members are Brad Woomer and

5   Marc Annotti each of whom holds a 7% member interest in the company.  Mr. Woomer

6   and Mr. Annoti are each "insiders" of DS Ventures as defined in the Bankruptcy Code.

7   Lakeside Capital Partners, LLC, a Delaware limited liability company

8   ("Lakeside") acted as a consultant and money manager for Lehman Brothers Holdings

9   which is currently in Chapter 11 and its subsidiary companies  Lehman Ali and Lehman

10  PAMI which are not in bankruptcy (referred to herein collectively as "Lehman").  Several

11  of the projects in which Lehman was involved with DS Ventures involved Lakeside.

12  Bryan Troxler through his affiliated and related entities ("Troxler") also acted

13  as a consultant and money manager for Lehman.  He has since been removed by

14  Lehman. DMB Ventures, LLC, a California limited liability company ("DMB") and SWA

15  Ventures, a California limited liability company as to McKinley VI ("SWA") was formed to

16  hold the membership interests in the seven residential real estate development projects

17  in which Troxler was involved located in Fresno, California.  These were and are real

18  estate entitlement transactions.  Properties would be purchased, entitled for the

19  construction of improvements and then sold.

20  DS Ventures and Lakeside are the members of LB/L-DS Ventures, LLC

21  ("Master 1").  Master 1 owns and controls the projects known as Fresno, Clovis, Playa,

22  Bakersfield, Lompoc Apartments and Mini-Storage and Lompoc II.

23  DS Ventures and Lakeside were also the members of LB/L-DS Ventures II

24  Master, LLC ("Master 2").  Master 2 owns or controls the projects known as Metropolitan,

25  San Feliciano, and Caheunga.

26  DS Ventures and Lakeside were also the members of LB/L III-DS Ventures

27  III Master, LLC ("Master 3").  Master 3 owns the retained interest in the Highland property

28  through its ownership of LB/L II – DS Ventures III Highland, LLC.

1    DS Ventures and Lakeside were also the members of LB/L III-DS Ventures

2  IV Master, LLC ("Master 4").  Master 4 owns the project known as Sherman Way.

3    DS Ventures was the operating member of Master 1, Master 2 and Master

4  4, the operation of which is governed by those certain Operating Agreement entered into

5  as of April 29, 1999, November 2001 and July 14, 2006, respectively, and as amended

6  (the "Agreements").  Lakeside is the other member in these entities.  Lakeside previously

7  acted as the managing member for Master 1, Master 2, Master 3 and Master 4.

8    Lakeside/Lehman had certain capital funding obligations with regard to the

9  projects and properties owned by and through Master 1, Master 2 and Master 4 which it

10  failed to honor. In spring 2009 DS Ventures gave Lakeside/Lehman notice of the defaults

11  which Lakeside/Lehman failed to cure.

12    Under the Operating Agreements governing the operation of each of the

13  entities, in the event of a default by a member (in this case Lakeside) the non-defaulting

14  member (in this case DS Ventures) could make the election to dissolve the entity.  DS

15  Ventures made this election.  The non-defaulting member, in the event of such election,

16  becomes the liquidating member.  Thus, upon making the demands and subsequent

17  elections DS Ventures became the liquidating member with the right to oversee the

18  winding up of Master 1, Master 2 and Master 4.  This is what it is doing.

19    a.    DS Ventures, LLC

20    (i)    Master 1 – DS Ventures and Lakeside are the

21  members of LB/L-DS Ventures, LLC ("Master 1").

22    (ii)    Fresno/Bakersfield – DS Ventures owns these

23  properties in partnership with Lehman and is currently completing the construction of the

24  nine remaining homes and the remaining site improvements on the Fresno property.  On

25  the Bakersfield property the owner is seeking to sell the eleven remaining finished lots to

26  satisfy the loan secured by the Property.  DS Ventures is attempting to extend the

27  permits to complete such construction in order to sell the remaining homes and/or lots in

28  order to retire the outstanding debt. In Fresno there are nine homes which are

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   approximately 65% complete.  Cathay Bank is the lender on this project.  The sum of

2   $300,000 is on deposit with Cathay Bank.  The outstanding loan balance is approximately

3   $320,000.  The homes are estimated to be worth $200,000 each.  The sum of $300,000

4   is estimated as necessary to complete the homes.  The completion and sale of the

5   homes will generate approximately $1,180,000 in net proceeds.

6           There are eleven finished lots in Bakersfield each having a value of

7   $350,000.  The outstanding loan balance is approximately $1,250,000.

8           (iii)     Clovis –DS Ventures was completing the build out of

9   89 single-family homes in Clovis, California.  The first phase of this project was entitled

10   and sold by DS Ventures.  The lender on this Property is Central Pacific Bank ("CPB")

11   which commenced an action for judicial foreclosure against the Property.  The owner of

12   this Property is exploring its options and also has litigation pending against Central

13   Pacific relating to its acts and omissions with regard to this loan. There is a question

14   regarding the validity of Central Pacific's lien against this Property securing the loan for

15   which the Debtor is a guarantor.  DS Ventures is overseeing the litigation pending in state

16   court relating to this matter.

17           (iv)     Playa Del Rey–DS Ventures in partnership with

18   Lehman acquired this property from the Howard Hughes Corporation in May 2002.  The

19   site is located at 63rd Avenue and Esplanade Street in Playa Del Rey, California and

20   fronts the Ballona Lagoon providing ocean views.  Presently, DS Ventures is in litigation

21   with the City of Los Angeles regarding the unauthorized down-zoning of the property.

22   DS Ventures is dealing with this litigation and is engaged in ongoing settlement

23   negotiations regarding this matter all in an effort to maximize the recovery on this

24   Property.  The lender on the property is Cathay Bank.  The outstanding balance on the

25   loan is approximately $1,156,000.  Cathay Bank obtained an appraisal of the property in

26   March 2009 which reflected a value of $6,800,000.  The owner is discussing the sale of

27   the Property with the City of Los Angeles and the City is obtaining its own appraisal for

28   the Property which should be completed by the end of October.  The Debtor is informed

1  that that the City Council has directed its staff to prepare for the acquisition of property

2  using a forecasted appraised value of $7,000,000.  Once the appraisal is completed and

3  reviewed the City will move into the acquisition mode for the property.  The time-frame for

4  this process is between six and seven months. The Debtor estimates a pro forma profit of

5  $2,900,000.

6           (v)      Lompoc Mini-Storage/Apartments – DS Ventures has

7  commenced construction of a 72,000 square foot mini-storage facility and a 64-unit

8  apartment building in Lompoc, Santa Barbara County, California.  Following the

9  completion of the construction of the project and the stabilization of the apartment units,

10  which average 870 square feet in size, it is estimated that the value of the project will be

11  in excess of $11 million, which when sold would result in an estimated pro forma net

12  profit in excess of $3.8 million. The projected NOI for the apartments once stabilized is in

13  excess of $700,000.  The construction loan for the apartments is with Preferred Bank.

14  The interest carry is built into the loan.  Thus, no payments are necessary.   The

15  construction of the apartments is scheduled to be completed in October 2009.

16  Thereafter, the lease-up is expected to take eight months.  Once stabilized and a take-

17  out loan obtained the net monthly income from the apartments will be $25,000.  The mini-

18  storage facility is also under construction.  Market surveys for the mini-storage property

19  indicate a monthly rental rate of $1.20 per square foot per month.  The estimated cash

20  flow from the facility based upon a 90% stabilization rate is $550,000 per year after debt

21  service.  The construction is being done is two phases, each one taking approximately six

22  months.  The total time to lease-up should be an additional 12 months.  The Debtor

23  estimates a pro forma value upon stabilization of $10.4 million resulting in a pro forma

24  profit of $5,000,000.

25           (vi)     Lompoc Land –This 40 acre site is located at the

26  corner of North Avenue and Bailey Avenue in Lompoc, Santa Barbara County, California.

27  The site is currently zoned AG-II-100 for agricultural uses. DS Ventures is currently

28  processing the annexation, zone change and general plan amendment applications to

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  allow for approximately 250 single family home lots (ten residential units per acre) and

2  100 apartment units. It is estimated that the tentative map will be approved in twenty-four

3  (24) or by September 2011. Upon approval DS Ventures will either develop the homes or

4  sell the land to a large public or private builder and build the apartment units. The

5  property is currently zoned as agriculture possessing a nominal current value. There is

6  an appraisal in process which has indicated a preliminary as-is land value of $3,560,000

7  and upon tentative map approval the estimated value of the land is $16.7 million. This

8  property is unencumbered by debt.

9          The City is currently processing a general plan amendment to increase the

10 permitted density on this parcel to match that of a neighboring parcel. Approval of this

11 amendment is expected to occur in January or February 2010. Thereafter, the mapping

12 process for the property will take another six to eight months and L.A.F.C.O. annexation

13 process will follow.. Accordingly, the plan is to secure funds to build the project or market

14 the property for sale in 2011 or 2012.

15          b.        Master 2 – DS Ventures and Lakeside were also the members

16 of LB/L-DS Ventures II Master, LLC ("Master 2").

17          (i)        Metropolitan –The Metropolitan Property is owned by

18 LB/L-DS Ventures Metropolitan II, LLC, a Delaware limited liability company whose sole

19 member is LB/L – DS Ventures II Master, LLC, a Delaware limited liability company

20 ("Master 2"). The members of Master 2 are DS Ventures and LB/Lakeside Capital

21 Partners, each owning a 50% membership interest.

22          The property is located in Hollywood on Sunset Boulevard just west of the

23 101 Freeway and was previously operated as a 12-story hotel with 25,000 square feet of

24 two story retail. It was acquired in 2005. Since the acquisition of the property DS has

25 entitled the property for redevelopment as a fifty-two (52) unit market rate apartment

26 building, 40,000 square feet of creative office space, seventy-nine apartment units to be

27 located on the adjacent lot and obtained the right to erect two supergraphic signs on the

28 apartment building (one to face eastward toward the 101 Freeway and the other to face

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  west on Sunset Boulevard).  Additionally, the adjacent seventy-nine (79) unit apartment

2  project will possess roof signage. The project design required DS Ventures to obtain

3  approval from the City to transfer the allowable floor area between the two separate

4  parcels, as well as, to obtain approval from the CRA for the wall-graphic signage.  The

5  approvals for the zone change to C2-2D-SN and two tentative maps for the Property

6  were approved by the City Planning Commission on July 13, 2006, the Los Angeles City

7  Council on December 13, 2006 and the Mayor on December 29, 2006, constituting final

8  approval.

9          DS Ventures has completed construction on, and obtained a certificate of

10  occupancy for, the apartment tower and is overseeing its lease-up. It is also completing

11  the negotiation of the agreements necessary to the erection of the signage.  The value of

12  such signage could be an amount equal to the price paid for the Property.

13          GE Commercial Capital ("GE") is the lender on the Property and failed to

14  honor its obligation to fund pursuant to the terms of the loan.  This has led to the filing of

15  numerous liens on the property and the filing of more than twenty-five law suits to

16  foreclose such liens.  GE has also recorded a Notice of Default against the property

17  commencing its non-judicial foreclosure action.  DS Ventures has responded to and is

18  funding such litigation and has brought a claim against GE based, in part, on a lender

19  liability cause of action.  DS Ventures is managing such litigation, overseeing the lease

20  up of the Property and considering options regarding the best course to preserve and

21  maximize the value of the Property.

22          Twenty-three of the fifty-two units in the apartment tower have been leased.

23  Upon stabilization of the apartment tower, the commencement of the receipt of signage

24  income estimated to be in excess of $120,000 per month, the completion of the

25  construction and stabilization of the 41,000 square foot creative office space, and

26  assuming that the adjacent parking lot parcel approved for 79 apartment units is sold, the

27  projected value for the property is $60 million.  This, in turn, results in a pro forma net

28  profit in excess of $20 million.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1    It is possible that this project will be placed in bankruptcy.  The sign income

2    of $120,000 is based upon conversations and negotiations had with the sign

3    management company.  The adjacent parking lot will be improved with 79 apartment

4    units.  Based upon appraisals, rental and market surveys and comps we assume a sales

5    price of $75-76,000 per unit. In May 2007 Ventures sold an apartment site located within

6    1 mile of this project for a purchase price in excess of $185,000 per unit (McCadden).

7    The market rental rate for the creative office based upon market surveys is $2.65 per

8    square foot - triple net.  When the tower, creative office and sign income is stabilized a

9    conservative estimate of the resulting NOI is $3.8 million.

10    The property is managed by The Eberly Company.  Attached is a copy of

11    the Property Management Report for July 2009.  The apartment tower is 42% occupied

12    generating rental income of $21,830.  The total operating expenses for the month

13    reported is $35,545.35.  As the occupancy rate increase the rental income will be more

14    than sufficient to cover operating expenses.

15    It is expected that signage will be erected on the property and signage

16    rentals will commence in the 4th quarter of 2009.  The net forecasted monthly sign

17    revenue is estimated to be $137,000.

18    (ii)    San Feliciano – DS Ventures and Lehman purchased

19    this 6.0 acre site located at 22255 Mulholland Drive (east of the San Feliciano

20    Drive/Mulholland Drive intersection), Woodland Hills, and California in December 2006.

21    DS Ventures designed this project to adapt hillside development and in compliance with

22    the guidelines and restrictions of the Mulholland Specific Plan.  It was also required that

23    any design be created to save and preserve the more than 100 oak trees located on the

24    site.  DS Ventures is completing the entitlement process for the construction of single-

25    family homes on the Property.  In order to expedite the tentative map approval process

26    and reduce finished lot costs, the number of approved units will be reduced from 23 to

27    19.  The homes constructed on these lots will average 2,405 square feet in size.  The

28    average expected sales price for each home, taking into account the current depressed

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   state of the real estate market, is $838,000.  Thus, the sale of the 19 homes generates

2   an estimated pro forma profit in excess of $4.3 million.

3           The lender on the property is Central Pacific who commenced a non-judicial

4   foreclosure proceeding against the Property which was placed into bankruptcy on June 1,

5   2009.  DS Ventures is currently supervising and managing the bankruptcy proceeding

6   and the litigation brought against Central Pacific based, in part, on its act and omissions

7   relating to this Property and the loan secured by it.

8           The price is based upon market studies and analysis with a discount given

9   to take into account the current state of the market.  When the project was acquired sales

10  prices in excess of $1 million were easily obtainable.  This price points was also

11  employed because it brings us within FHA pricing.

12          This project is in bankruptcy and a plan has been proposed in this case.

13  Under the plan a priming loan will be obtained to fund the construction of the project.

14                  (iii)    Caheunga –DS Ventures purchased this 5.97 acre site

15  located at 2775 Caheunga Boulevard in Hollywood, California in partnership with

16  Lehman.  The site has been re-zoned for seventy-five market rate apartment units and a

17  tentative map has been approved.  DS Ventures intends to move the project on to the

18  construction phase by either self-funding or the use of outside equity.  Because the

19  current state of the real estate and capital markets the only exit strategy is to build out of

20  the Project.  Thus, DS Ventures is negotiating with various non-traditional funding

21  sources to obtain the funds necessary to undertake the construction of the Project.

22  Following the construction of the project and the stabilization of the 75 apartment units,

23  which will average 769 square feet per unit, the project will have an estimated value of

24  $27 million, resulting in a net pro forma profit of $8 million.

25          The lender on the property recorded a notice of default against the property

26  on July 8, 2009.  DS Ventures is engaged in ongoing discussions with the lender

27  regarding the restructure of the debt.

28          The plan is to construct 75 apartment units.  The constructions costs will be

[MSH\LIT\529827.1]                              28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   approximately $200 per square foot plus usual and customary soft costs. The forecasted

2   rental value is $3 per square foot. When stabilized the gross rental income will be

3   approximately  $2.3 million resulting in an NOI $1.7 million.

4           DS Ventures is discussing joint venturing the property with various groups.

5   The intention is to obtain HUD financing for the project. It is estimated that construction

6   will commence on Cahuenga in September 2010.

7           Additionally, the HUD loan will provide an additional $20,000 per month to

8   cover overhead. The timeframe for the completion of construction is between 18 and 22

9   months.

10          c.       Master 3 –DS Ventures and Lakeside were also the members

11  of LB/L III-DS Ventures III Master, LLC ("Master 3").

12                  (i)       Highland –DS Ventures in partnership with Lehman

13  acquired this parcel located south of Sunset Boulevard on Highland Avenue in the

14  Hollywood section of Los Angeles in November 2005. DS Ventures entitled the property

15  for 56 residential units and 7,000 square feet of ground floor commercial space. The

16  property was in March 2006. However, pursuant to the terms of such sale DS Ventures

17  retained the interest in the commercial space which Lennar is required to build out and

18  deliver the ground floor space to a shell and return it to the DS Ventures at no cost. DS

19  Ventures is monitoring the project to ensure the reconveyance on the commercial space

20  when construction is completed. It is estimated such space will have a value of

21  approximately $3,000,000. This is based upon prior offers by the buyer to buy out of the

22  put back obligation for amounts in excess of $1,000,000.

23          The reconveyance is triggered by the completion of the construction of the

24  property by Lennar. No construction has occurred on the property. Last October there

25  was a proposed sale of the property and Lennar desired in connection with the sale to

26  purchase our reversionary interest for the sum of $2,000,000. However, the sale was no

27  consummated. DS Ventures is not subordinated to any construction lender and cannot

28  be without its express consent.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1          d.    Master 4 – DS Ventures and Lakeside were also the members

2  of LB/L III-DS Ventures IV Master, LLC ("Master 4").

3          (i)    Sherman Way –DS Ventures in partnership with

4  Lehman acquired this 2.18 acre site located at 14717 Sherman Way, Van Nuys,

5  California east of the Kester Avenue/Sherman Way intersection. The project is designed

6  for 63 detached row homes under the Small Lot Subdivision Ordinance. The application

7  for a tentative tract map was approved by the Planning Advisory Agency on May 11,

8  2007. DS Ventures is exploring its opportunities with regard to this Property and

9  currently intends to construct either the row homes or apartments on the Property.

10  Assuming, however, that if the 63 single-family homes are constructed averaging in size

11  of 1,300 square feet and that the units can yield an average sales price, taking into

12  account today's depressed real estate market, of $350,000, the estimated pro forma

13  profit generated by the project is in excess of $6 million. A sales price of $265 per square

14  foot was assumed based upon appraisals, market and rental surveys and comps.

15          Comerica is the current lender on the property. Various parties are

16  interested in making the construction loan for the property. The loan documentation will

17  contain a lot release provision with Comerica. The estimated start time for construction is

18  July 2011. The contemplated loan will contain a line item to cover overhead in the

19  amount of $15,000 per month. The project will be constructed in three phase with each

20  phase taking approximately seven months to complete. Final completion will be mid-

21  2013.

22          e.    Fountain/Wilcox –DS Ventures controlled that certain 1.27

23  acre site located at 1277 Wilcox Avenue, Los Angeles, California. The project was

24  designed for thirty-four single family units under the new Small Lot Subdivision

25  Ordinance. The project required the preservation of a historic structure located on the site

26  which was donated to the Hollywood Community Housing Corporation. This project has

27  been sold. As a part of the purchase price, DS Ventures received a $100,000 equity

28

1  interest in the project and a promissory note executed by the purchaser in the amount of

2  $1,000,000.

3          The project has opened models, is completing the first phase of

4  construction and is beginning to market units for sale. DS Ventures is working to

5  maximize the likelihood that it will obtain the payment of its note and its $100,000 equity

6  participation interest.  Such efforts include working to assist the current owner and its

7  development team in its dealing with the City and the various historical preservation

8  entities.

9          A copy of the Promissory Note is attached.  The Note is secured by a

10  second trust deed on the property.  Interest accrues on the Note at a rate equal to the

11  Bank of America Prime Reference Rate (approximately 8%).  The payments are to be

12  made from the proceeds of the sale of the homes after the repayment of capital

13  contributions and a preferred return on such investment.  It is expected that payments will

14  commence upon the completion of the first phase of construction.  The first phase is 50%

15  sold.  It is estimated that the second phase will commence in three months and will take

16  seven months to complete.

17          f.      Sports Authority – The property is owned by Sepulveda WLA

18  Ventures, LLC, a Delaware limited liability company which has two members each

19  owning a 50% membership interest: Troxler Value Fund 6, LLC, a Delaware limited

20  liability company and DS Ventures.

21          DS Ventures acquired the existing 97,600 square foot, three-story mixed-

22  use building located at the corner of Sepulveda Boulevard and Missouri Avenue in Los

23  Angeles, California.  The property is currently 100% occupied by a Sports Authority store

24  on the ground floor (comprising 31,600 square feet) and by Westwood Self Storage on

25  the 2nd and 3rd floors (comprising 66,000 square feet).  The master lease on the mini-

26  storage is currently substantially below market with approximately fifteen months

27  remaining on the lease.  DS Ventures is currently in discussions to terminate the current

28  master lease on the mini-storage and re-lease the space at market rates.  The Sports

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Authority lease is also currently substantially below market and terminates in

2  approximately seven years.  DS Ventures is investigating a revenue sharing clause in the

3  lease which is based on a base-line dollar amount set many years ago.  DS Ventures

4  believes that this could result in substantial additional revenue under this lease. The

5  property is also eligible for advertising signage relating to any products or manufacturers

6  which sell products at the Sports Authority (i.e., Nike, Reebok).  There is currently

7  potential for two such signs and DS Ventures is working to maximize revenues obtained

8  from this property.

9           The Debtor has a "bad boy" guaranty of the loan secured by the property.

10  Since his filing for bankruptcy protection the bookkeeping duties relating to this project

11  have been assumed by the principal of the other member in the entity which owns the

12  property who is also seeking to replace Schwartzman on his guaranty.  It is estimated

13  that the equity interest of DS is worth $2,000,000.  This is based upon prior pro forma

14  projections adjusted to take into account current market conditions.

15           The property currently generates approximately $182,000 in monthly

16  revenues and all revenue is utilized to pay debt service and other current expenses.

17  Attached are copies of rent checks for July 2009.

18           g.       St. Lukes – DS Ventures in partnership with Lehman acquired

19  the former St. Luke Medical Center located at Washington Boulevard and Altadena Drive

20  in Pasadena, California.   The property consists of 13.4 acres on which is currently

21  located a 130,000 square foot hospital building, two office buildings, seven single family

22  dwellings and a ten acre surfaced parking lot.  DS Ventures has worked to obtain a

23  Conditional Use Permit ("CUP") to convert the hospital portion of the Property to an

24  Assisted Living Facility and to lease-up the two existing office buildings and receive

25  approval for an additional three office buildings totaling 100,000 square feet.  DS

26  Ventures has also explored the construction of 160 age restricted apartment units.

27           Lehman held the debt on the project which it pledged as collateral.  Such

28  collateral was executed upon by its creditors and the loan is now overseen by a receiver.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

1  DS Ventures has been actively working with the receiver to manage the Property and to

2  maximize its value.  DS Ventures is also assisting the receiver in the conduct of its due

3  diligence for the property.  DS Ventures, in connection with these efforts, is also exploring

4  the possibility of staying in the deal as a joint venture partner with the ultimate owner or

5  developing and managing the property for a fee to be determined.  Failing one of these

6  outcomes DS Ventures will attempt to negotiate its disengagement from the project.

7        St. Luke's has monthly revenue from a 30,000 square foot medical office

8  building and all revenue is utilized to pay operating expenses for the property. Attached is

9  a copy of monthly report for the month ended July 31, 2009.

10        St. Luke's is owned by LB/L IV-DS Ventures Pasadena Master, LLC, a

11  Delaware limited liability company which has two members each owning a 50%

12  membership interest: LB/Lakeside Capital Partners IV, LLC, a Delaware limited liability

13  company (a Lehman Brothers investment vehicle) and DS Ventures.

14        Lehman was both the lender as well as an equity partner in the transaction.

15  The loan has a full interest reserve. Lehman pledged the loan as collateral to a

16  reinsurance company known as Pulsar RE located in the island of Bermuda.  DS

17  Ventures has been in discussions with Pulsar regarding venturing the property with a new

18  basis upon contribution.  Pulsar has a bankruptcy hearing in New York in October to

19  confirm its ownership of the collateral.  Opposition has been filed in this matter.  If the

20  project is ventured with Pulsar, according to budget estimates,  DS Ventures should

21  receive around $25,000 a month to process the entitlements and receive a 50% profits

22  interest in the project.

23        h.    San Vicente –DS Ventures acquired an undivided three-

24  quarter tenancy-in-common interest in that certain 16,000 square foot office building

25  located at 113 North San Vicente Boulevard, Beverly Hills, California in March, 2008.

26  The property consists of two floors of office space and two floors of parking space located

27  on the ground floor and one level of subterranean parking. The property is currently listed

28  for sale or lease and is frequently shown. DS Ventures occupies a portion of this

1  property and manages its operation. A notice of default was recorded by the lender

2  against the property on July 10, 2009. DS Ventures is negotiating with the lender and the

3  other tenant-in-common to revise the debt and the carry cost of the property enabling the

4  property to be held until the recovery of the market.

5          i.      Variel – DS Ventures purchased this property located in the

6  Warner Center section of Woodland Hills in January, 2008. The property consists of

7  147,000 square feet: 102,500 square feet of office space and 45,400 square feet of 22'-

8  24' clear-height warehouse space. DS Ventures is currently assisting with the lease up

9  of the Property. Based upon the change in the real estate market DS Ventures is

10  negotiating with the lender to surrender the property in exchange for a release from

11  liability.

12          j.      DMB Ventures, LLC –

13          (i)     McKinley Properties – This project is owned with

14  Lehman Brothers through DMB and its affiliate SWA. The projects are located in Fresno,

15  west of the 99 Freeway and comprise an assemblage of 107 acres that will yield

16  approximately 458 single-family homes. Tentative maps have been approved and the

17  properties are currently being annexed into the City of Fresno for development purposes.

18  The construction of the single-family homes, which will have an average size of 1,434

19  square feet and an average sales price, using today's depressed market values, of

20  $206,000, would generate a pro forma profit of $28.4 million.

21          The values are based upon current sales of similar product occurring within

22  a one mile radius of the project.

23          6.      Riverfront – DS Ventures in partnership with Lehman owns this 66

24  acre site located at the northwest corner of Josephine Avenue and Riverside Country

25  Club Drive in Fresno, California. The project, adjacent to the San Joaquin River, required

26  a design that preserved a federally endangered species and provided protection to a

27  riparian habitat. DS Ventures split the parcels under two tentative tract maps and

28  received approval from the Planning Commission for a zone change to R1 and a tentative

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1   map on approximately 52 acres for 230 single family lots on November 16, 2005.  The

2   remaining acreage is currently awaiting a general plan amendment review and approval.

3   Upon final approval the project will consist of 230 single family lots and 180+ garden

4   apartment units and 200,000 square feet of class A industrial space which will be

5   changed to accommodate 160 apartment units..  The lender on this property is also

6   Central Pacific which instituted a non-judicial foreclosure proceeding against this

7   Property.  The sale of the Property was scheduled for July 15, 2009.  A continuance of

8   this sale was requested of Central Pacific, which request was denied. Consequently the

9   project was placed in bankruptcy to protect its value on July 13, 2009.

10          The intent is to construct 213 single-family homes and sell 17 premium

11  river-bluff lots.  The homes will have an average size of 1,434 square feet.  The average

12  sales price, utilizing today's depressed values, is estimated to be $248,000.  This

13  generates a pro forma profit in excess of $12.5 million.

14          Following the approval of the 168 apartment units the Debtor intends to sell

15  the property for $15,00 per unit for a total of $2,500,000 resulting in a profit of

16  $1,100,000.

17          Former Industrial –this land will be entitled for 160 apartment units which

18  will have a value of $15,000 per unit for a value of $2.7 million.  The projected profit for

19  just the land is $1,500,000.

20          This project is in bankruptcy and a plan will be proposed which will include

21  obtaining a priming loan.  The total pro forma profit is estimated to be $15,100,000.

22  **C.    Liabilities**

23          1.    Secured Claims

24                a.    Countrywide Home Loans:  Countrywide is the lender and

25  holder of the first trust deed on Debtor's personal residence.   The amount of the loan is

26  currently $2,238,288.

27                b.    Monkarsh:  Monkarsh is the lender and holder of the second

28  and third  trust deeds on Debtor's personal residence.   The monies from these loans

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    were used by the Debtor to fund the DSV business operations.  The loans have principal

2    balances of $420,000, and $512,500 respectively.

3            2.    Credit Card Debt –

4                a.    American Express – balance due on American Express credit

5    card is $4,603.

6                b.    Bank of America – balance due on Bank of American credit

7    card is $11,273.

8            3.    Indemnity of Sureties –

9                a.    Aon Insurances Services – The Debtor executed an indemnity

10    agreement in connection with certain surety bonds issued for the benefit of his business.

11    Debtor believes that there is no liability existing under such indemnities.

12                b.    Noddle Surety & Insurance – The Debtor executed an

13    indemnity agreement in connection with certain surety bonds issued for the benefit of his

14    business.  Debtor believes that there is no liability existing under such indemnities.

15                c.    Lexon Insurance Company/Bond Safeguard Insurance

16    Company -  The Debtor executed an indemnity agreement in connection with certain

17    surety bonds issued for the benefit of his business.  Debtor believes that there is no

18    liability existing under such indemnities.

19            4.    Title Indemnities –

20                a.    Fidelity Title Insurance Company – The Debtor executed an

21    indemnity agreement in connection with certain title matters in connection with the

22    issuance of title policies in which various of the entities comprising his business was

23    involved.  Debtor believes that there is no liability existing under such indemnity

24    agreement

25            5.    Loans –

26                a.    Lehman Brothers –The Debtor entered into that certain Loan

27    Agreement  as the Borrower and Lehman Brothers Holdings, Inc. ("Lehman") as the

28    Lender, dated May 7, 2008 (the "Loan Agreement").  Pursuant to the terms of the Loan

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  Agreement the loan was to fund in equal monthly installments of $227,500 commencing

2  in May 2008 and continuing on the first day of each month thereafter through March 1,

3  2009.  The last disbursement pursuant to the Loan Agreement was received in early

4  September 2008.  The disbursements to be made on October and November 1 were not

5  received.  On November 25, 2008 Lehman was provide with a written notice of its default

6  under the Loan Agreement and a demand that Lehman immediately cure the same and

7  inform the Debtor as to its intentions regarding the future funding obligations under the

8  Loan Agreement.  No response was received to this demand nor was funding resumed.

9  The amount outstanding under this is $1,270,000.

10              6.    Legal Services –

11                  a.    Meister & Selig – This firm was retained to represent DS

12  Ventures, et al., in connection with the matter involving Central Pacific Bank.  The firm

13  demand and was paid large amounts considering the amount of work performed and the

14  results obtained.  The firm claims to be owed approximately $81,000.

15                  b.    Corleto,  Ackerman & Hearn/Corleto & Ackerman – DS

16  Ventures was previously represented by the law firm of Corleto, Ackerman & Hearn LLP

17  ("CAH").  DS Ventures entered into various fee arrangements whereby CAH would

18  perform legal services for which it would be compensated based upon the performance of

19  DS Ventures.

20              Certain sums are asserted to be due and will become due to the former

21  CAH. Richard Corleto, who is one of the principals of CAH has been negotiating with DS

22  Ventures and Mr. Schwartzman regarding his firm's claim for unpaid attorneys' fees.  The

23  parties are attempting to resolve their differences.   .  It is asserted that the following is

24  now due to CA ("Corleto & Ackerman"), not CAH, from Schwartzman:

25              Build Projects -              $63,000 + $1,000 per closing from 8/7/07

26              Completed Projects -          15,000 for McCadden plus 4.5%

27              Fountain -              72,340 + 4.5% of further sums received

28              Uncompleted Projects -       4.5% from future projects

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

[MSH\LIT\529827.1]                        37

1    These payments total $150,340, not counting the continuing 4.5% interest

2    in the further sums received.

3          7.     Line of Credit –

4          a.     US Bank – The Debtor has two lines of credit with US Bank.

5    The current balance on these Lines is $225,000 and $100,786.39, respectively.

6          8.     Ziegler Family Trust –

7          a.     Debt –The Debtor previously borrowed various sums from the

8    Trust for use in his business. He executed various promissory notes and other debt

9    instruments in favor of the Trust and the Trust may have incurred various other

10   obligations for which the Trust may have a claim against the Debtor (the "Trust Debt").

11   The outstanding principal balance of the Trust Debt is approximately $5,764,000 and

12   such sum is scheduled in the Bankruptcy Case.

13         b.     Indemnity – Central Pacific Bank ("Central Pacific") has made

14   two construction loans to entities in which DS Ventures is a member (the "Construction

15   Loans"). These projects are referred to as Clovis and Riverfront. In connection with the

16   Clovis Construction Loan, the Trust executed a guarantee in favor of Central Pacific in

17   the amount of $2,500,000. In connection with the Riverfront Construction Loan, the Trust

18   executed a guarantee in favor of Central Pacific in the amount of $1,250,000. This is

19   referred to herein as the "Guarantee Liability." Central Bank has commenced litigation

20   seeking to enforce the Guarantee Liability. If the Trust must pay under the Guarantees, it

21   may have recourse against the Debtors. The parties have scheduled a mediation with the

22   Trust, Central Pacific Bank, the Debtor, Riverfront, Clovis and San Feliciano for October

23   7, 2009, in order to attempt to resolve these issues.

24         c.     Pledged Collateral – The Debtor currently has in place a line

25   of credit (the "Line of Credit") with Cathay Bank ("Cathay Bank") with an outstanding

26   balance, as of July 29, 2009, of approximately $7,754,893. The Line of Credit is used in

27   the operation of the Debtors' businesses. In establishing the Line of Credit, Cathay Bank

28   required that security be provided. In satisfaction of this requirement the Trust pledged

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1  various assets to Cathay Bank as collateral for the Line of Credit (the "Cathay Bank

2  Collateral"). Cathay Bank has threatened to exercise its rights with regard to the Cathay

3  Bank Collateral. This is referred to as the "Line of Credit Obligation." If Cathay Bank

4  exercises its rights with regard to the Cathay Bank Collateral to satisfy the obligation of

5  Schwartzman the Trust would have a claim against Schwartzman.

6         d.     In addition, the Trust has previously guaranteed and secured

7  various other obligations of the Debtors and incurred various liabilities and expenses with

8  regard to its relationship with the Debtors (the "Additional Liability") for which it may claim

9  the Debtors are ultimately responsible.

10       9.    Loan Guarantees –

11        a.    Cathay Bank –

12         (i)    Fresno/Bakersfield – The outstanding balance of the

13 loan on Bakersfield is $1,273,155 and the outstanding balance of the loan on Fresno is

14 $325,853. These projects are cross-collateralized and the Debtor has personal liability

15 for any deficiency in the repayment of these loans.

16        b.    Playa Del Rey – None.

17         (i)    Central Pacific Bank –

18         (ii)    Clovis – The Debtor has a limited payment guarantee

19 on the loan secured by this property in the amount of $2,500,000.

20         (iii)    Riverfront – The Debtor has a limited payment

21 guarantee on the loan secured by this property in the amount of $5,000,000.

22         (iv)    San Feliciano – The outstanding balance due on the

23 loan secured by this property is $3,900,000. The Debtor has a full payment guarantee for

24 this loan.

25        c.    Comerica Bank –

26         (i)    Lompoc Mini-Storage – The Debtor has a payment

27 guarantee on the loan secured by this property in the amount of $5,748,000.

28

1          (ii)      Sherman Way – The Debtor has a payment guarantee

2   on the loan secured by this property in the amount of $4,441,000.

3          d.      East-West Bank –

4          (i)      Riverfront – There are two loans from East-West Bank

5   secured by this property.  The outstanding balance due on these loans is $1,153,042 and

6   $1,409,648.  The Debtor has payment guarantees of these loans.

7          e.      First Regional Bank –

8          (i)      San Vicente – The outstanding balance due on the

9   loan secured by this property is approximately $6,160,000.  The Debtor has a payment

10  guarantee for this loan.

11         f.      GCRE II –

12         (i)      Variel – The outstanding balance due on the loan

13  secured by this property is approximately $27,300,000.  The Debtor has a $1 million

14  payment guarantee for this loan.

15         g.      OCP –

16         (i)      Variel – The Variel property was purchased from

17  Optical Communications Products, Inc. ("OCP").  A portion of the purchase price

18  consisted of a promissory executed in favor of OCP in the amount of $1,250,0000.  The

19  Debtor guaranteed the repayment of this note to the extent of $725,000.

20         h.      Preferred Bank –

21         (i)      Caheunga – The Debtor has a limited payment

22  guarantee on the loan secured by this property in the amount of $1,550,000.

23         (ii)      Lompoc Apartments – The Debtor has a limited

24  payment guarantee on the loan secured by this property in the amount of $3,600,000.

25         10.      McKinley IV, V and VI – The Debtor has payment guarantees on the

26  loans secured by these properties as follows: McKinley IV - $969,833; McKinley V -

27  $739,550; and McKinley VI - $4,635,000.

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

1    a.    Capmark – This loan is secured by the Sports Authority

2 property.  The Debtor has a "bad boy" guaranty for this loan.

3    b.    GE Financial – This loan is secured by the Metropolitan

4 project.  The Debtor has a completion guaranty for this loan.

5 **D.    Events Occurring After Bankruptcy Filing**

6    1.    Employment Of Professionals

7    On June 29, 2009 the Debtor filed its *"Application by Debtor and Debtor in*

8 *Possession for Approval of Employment of Bankruptcy Counsel (SulmeyerKupetz);*

9 *Declaration of Victor A. Sahn in Support Thereof"* (the "Application").

10    2.    Administrative Matters

11    The Debtor was required to address the various administrative matters

12 attendant to the commencement of this Case.  These matters included the preparation of

13 the Debtor's Schedule of Assets and Liabilities and Statement of Financial Affairs, and

14 the preparation of the materials required by the OUST, including, without limitation, the 7-

15 Day Package for the Debtor.  The Debtor has made every effort to comply with its duties

16 under 11 U.S.C. §§ 521, 1106 and 1107 and all applicable OUST guidelines, including

17 the filing of the Debtor's Monthly Operating Reports with the OUST.  The Debtor also

18 attended its initial interview with the OUST, and the Meeting of Creditors required under

19 11 U.S.C. § 341(a).

20    3.    Bar Date

21    As of the filing of this Disclosure Statement, a Bar Date has not been set.

22 Concurrently with the filing of this Disclosure Statement, the Debtor will cause to be filed

23 the appropriate motion to establish a deadline for creditors, including governmental

24 entities, to file proofs of claim.  Pursuant to that motion, the Debtor will propose a claims

25 Bar Date of December 15, 2009.

26    4.    Budget Motion:

27    The Debtor filed a motion for authority to use funds of the estate to pay for

28 his ordinary living expenses as well as for the authority to fund the business expenses of

[MSH\LIT\529827.1]                    41

1 DSV (the "Budget Motion").   The Budget Motion has been granted on an interim basis,

2 and a continued hearing on the motion is scheduled for October 28, 2009.

3 IV.

4 **SUMMARY OF PLAN**

5 **A.    What Creditors and Interest Holders will Receive Under the Plan**

6 As required by the Bankruptcy Code, the Plan classifies Claims and

7 Interests in various classes according to their right to priority.  The Plan states whether

8 each class of claims or interests is impaired or unimpaired.  The Plan provides the

9 treatment each class will receive.

10 **B.    Unclassified Claims**

11 Certain types of Claims are not placed into voting classes; instead they are

12 unclassified.  They are not considered impaired and they do not vote on the Plan

13 because they are automatically entitled to specific treatment provided for them in the

14 Bankruptcy Code.  As such, the Debtor has not placed the following claims in a class:

15 1.    Administrative Expenses

16 Administrative expenses are claims for costs or expenses of administering

17 the Case that are allowed under Bankruptcy Code section 507(a)(2).  The Bankruptcy

18 Code requires that all Administrative Claims he paid on the Effective Date unless a

19 particular claimant agrees to a different treatment.

20 The following chart lists all of Debtor's estimated section 507(a)(2)

21 Administrative Claims and their treatment under the Plan:

22

23

24

25

26

27

28

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL. 213.626.2311 • FAX 213.629.4520

[MSH\LIT\529827.1]

| Name | Code § | Allowed to Date | Total Estimated[1] | Paid By Debtor to Date | Total Estimated Required to Be Paid on the Effective Date | Treatment |
|---|---|---|---|---|---|---|
| SulmeyerKupetz, A Professional Corporation, general counsel for Debtor | 507(a)(2) | $.00 | $250,000 | $100,000 (Retainer) | $150,000 | In the event that there are unpaid fees and expenses that are allowed by the Court, unless otherwise agreed, the unpaid amounts shall be paid in full, in Cash, on the later of: (a) the Effective Date; or (b) the fifth Business Day after the order allowing such Administrative Claim becomes a Final Order. |
| Hudgens & McCann | 507(a)(2) | 0.00 | 50,000 | 0 | 50,000 | In the event that there are unpaid fees and expenses that are allowed by the Court, unless otherwise agreed, the unpaid amounts shall be paid in full, in Cash, on the later of: (a) the Effective Date; or (b) the fifth Business Day after the order allowing such Administrative Claim becomes a Final Order |
| Gold & Gold | 507(a)(2) | 0.00 | 20,000 | 0 | 20,000 | In the event that there are unpaid fees and expenses that are allowed by the Court, unless otherwise agreed, the unpaid amounts shall be paid in full, in Cash, on the later of: (a) the Effective Date; or (b) the fifth Business Day after the order allowing such Administrative Claim becomes a Final Order |

[1] All Professional fees are subject to Allowance in by Order of the Bankruptcy Court.

| Name | Code § | Allowed to Date | Total Estimated[f] | Paid By Debtor to Date | Total Estimated Required to Be Paid on the Effective Date | Treatment |
|---|---|---|---|---|---|---|
| Knopfler & Pazos | 507(a)(2) | 0.00 | 35,000 | 0 | 35,000 | In the event that there are unpaid fees and expenses that are allowed by the Court, unless otherwise agreed, the unpaid amounts shall be paid in full, in Cash, on the later of: (a) the Effective Date; or (b) the fifth Business Day after the order allowing such Administrative Claim becomes a Final Order |
| Clerk, Bankruptcy Court Fees | 507(a)(2) | | $355,000 | $100,000 | $255,00 | Paid in full on the Effective Date |

### 2.    Court Approval Of Fees Required

The Court must rule on all fees listed in this chart before the fees will be owed, except for fees owing to the Clerk's Office and U.S. Trustee or fees to be paid from non-debtor sources. The Professional in question must file and serve a properly noticed fee application, and the Court must rule on the application. Only the amount of fees and expenses Allowed by the Court will be owed and required to be paid under the Plan. As discussed in this Disclosure Statement, the Debtor will have sufficient funds from its continued operations, infusions of capital, and existing retainers, to satisfy the foregoing Administrative Claims.

### 3.    Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment, property and other taxes described by Bankruptcy Code section 507(a)(8). The Bankruptcy Code requires that each holder of such a section 507(a)(8) Priority Tax Claim receive the present value of such claim in deferred cash payments, over a period not exceeding five (5) years from the Petition Date. The Debtor is unaware of any Priority Tax Claims.