Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number
Victor A. Sahn (CA Bar No. 97299)
Mark S. Horoupian (CA Bar No. 175373)
**Sulmeyer**Kupetz, A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520
*Attorneys for DAVID SCHWARTZMAN, Debtor in Possession*

FOR COURT USE ONLY

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

In re:

DAVID SCHWARTZMAN,

Debtor.

CHAPTER 11

CASE NUMBER 1:09-bk-16565 MT

HEARING DATE: May 17, 2010
TIME: 10:00 a.m.
PLACE: U.S. Bankruptcy Court
Courtroom 302
21041 Burbank Blvd.
Woodland Hills, CA 91367

# NOTICE OF OBJECTION TO CLAIM

1. **TO** *(specify claimant and claimant's counsel, if any)*: **GENERAL ELECTRIC BUSINESS FINANCIAL SERVICES, INC. AND THEIR ATTORNEYS OF RECORD**

2. **NOTICE IS HEREBY GIVEN** that the undersigned has filed an objection to your Proof of Claim **(CLAIM # 25-1)** filed in the above referenced case. The Objection to Claim seeks to alter your rights by disallowing, reducing or modifying the claim based upon the grounds set forth in the objection, a copy of which is attached hereto and served herewith.

3. **Deadline for Opposition Papers:** You must file and serve a response to the Objection to Claim not later than 14 days prior to the hearing date set forth above.

**IF YOU FAIL TO TIMELY RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

DATED: April 16, 2010

**Sulmeyer**Kupetz, A Professional Corporation
*Law Firm Name*

By: */s/ Mark S. Horoupian*

DATE NOTICE MAILED: April 16, 2010

Name: Mark S. Horoupian
*Attorney for Objector*



American LegalNet, Inc.
www.Forms*Workflow*.com

Victor A. Sahn (CA Bar No. 97299)
vsahn@sulmeyerlaw.com
Mark S. Horoupian (CA Bar No. 175373)
mhoroupian@sulmeyerlaw.com
**Sulmeyer**Kupetz
A Professional Corporation
333 South Hope Street, Thirty-Fifth Floor
Los Angeles, California 90071-1406
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Debtor in Possession,
David Schwartzman

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION**

In re

DAVID SCHWARTZMAN,

Debtor in Possession.

Case No. 1:09-bk-16565 MT

Chapter 11

**DEBTOR'S MOTION FOR ORDER DISALLOWING CLAIM OF GENERAL ELECTRIC BUSINESS FINANCIAL SERVICES, INC. (CLAIM NUMBER 25-1): MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF DAVID SCHWARTZMAN IN SUPPORT THEREOF**

**DATE:** May 17, 2010
**TIME:** 10:00 a.m.
**PLACE:** U.S. Bankruptcy Court
Courtroom 302
21041 Burbank Boulevard
Woodland Hills, CA 91367

David Schwartzman, Debtor and Debtor in Possession herein, hereby moves this Court for an order disallowing the claim (Claim Number 25-1) of General Electric Business Financial Services, Inc. ("GE"). In support of his objection, the Debtor respectfully submits the attached Declaration of the Debtor. GE's claim must be disallowed for the following reasons:



**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

A. By its proof of claim, GE asserts that the Debtor is liable for the full amount of the loan GE made to LB/L-DS Ventures Metropolitan II, LLC, a Delaware limited liability company (hereinafter "DSV Met"). In seeking to impose the full burden of DSV Met's alleged liability upon the Debtor, GE asserts that Debtor is contractually obligated in this regard pursuant to a "Performance and Completion Guaranty" (hereinafter the "Completion Guaranty"). GE wrongfully, and without any basis in law or fact, attempts to elevate the Debtor's agreement to guaranty the completion of the construction to a **recourse** guaranty of the loan balance. This argument is contrary to the plain language of the Completion Guaranty, and appears to have been made frivolously and without regard for the truth, and in an attempt to harass the Debtor and to gain leverage in the Debtor's case and pending nonbankruptcy litigation (the "Lender Liability Lawsuit");[1] and

B. With respect to the limited obligations that the Debtor actually did personally guaranty, GE must be denied any recovery because all alleged damages associated with the project have arisen directly and been caused by GE's failure to fund the loan as contractually required. The conditions for liability under the guaranty simply do not exist. As set forth in the Lender Liability Lawsuit, after acquiring the Loan from the original lender, Merrill Lynch, GE alleged various manufactured nonmonetary defaults in a calculated effort to escape its obligation to fund construction draws. It is important that the Court realize that the funds to complete the remaining construction of the Project and to pay interest and property taxes (the very things that GE claimed as defaults) were and remain fully available and disbursable under the Loan. In fact, this failure is the subject of

---

[1] As discussed below, in addition to its participation in the Debtor's bankruptcy case, GE is involved in litigation with the DSV Met, the Debtor, and other parties in State Court (the "Lender Liability Suit"), wherein DSV Met has sued GE for lender liability arising out of its wrongful failure to fully fund the construction loan. Among other things, DSV Met alleges that GE's failure to fund was not only wrongful but has also significantly decreased the value of the Project. A true and correct copy of the Lender Liability Suit (without exhibits) is attached hereto as Exhibit 1.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

the pending Lender Liability Lawsuit.

For the reasons presented herein, the Debtor respectfully requests that the Court issue an order:

(1) Finding, adjudging and decreeing that the Debtor has no liability under the express and unequivocal terms of the Completion Guaranty with respect the principal amount of the underlying loan, late charges, accrued interest, or real property taxes; and

(2) With respect to the Debtor's guaranty of the completion of the construction of the Project (the "Completion Guaranty Obligations"), that the Debtor's performance was excused by GE's failure to fund the project or, alternatively, that such obligation has not yet matured.

DATED: April 16, 2010

Respectfully submitted,

**Sulmeyer**Kupetz
A Professional Corporation

By: */s/ Mark S. Horoupian*
Victor A. Sahn
Mark S. Horoupian
Attorneys for David Schwartzman,
Debtor and Debtor in Possession

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.

**STATEMENT OF FACTS**

**A. GENERAL BACKGROUND**

1. LB/L-DS Ventures Metropolitan II, LLC, a Delaware limited liability company (the "Borrower") is the owner of that certain real property located in Hollywood, California (the "Project"). The Project consists of three components: a twelve story tower containing 52 apartment units (the "Apartments"), a two-story building containing approximately 38,000 square feet of commercial creative office space (the "Creative Office"); and, an adjacent lot which is entitled for the construction of 79 apartment units (the "Lot"). In addition, the Project is approved for the placement of two large commercial signs.

2. Merrill Lynch Capital ("Merrill") was the original lender on the Project. On or about August 2, 2007 Merrill loaned Borrower the sum of $40,510,344 (the "Loan") in order to develop the project. The Loan was evidenced by a note executed in favor of Merrill and secured by deed of trust on the Project, and a Loan Agreement. A true and correct copy of the Loan Agreement is attached hereto as Exhibit 2. The Debtor and LB/L-DS Ventures II Master, LLC, a Delaware limited liability company ("Master 2") executed a Performance and Completion Guaranty in favor of Merrill in connection with the Loan.

3. Under the express terms of the Loan, Merrill was to disburse the proceeds as follows:

a. $21,166,829, the "Closing Funding Amount," was to be used to pay off the Property acquisition loan then in place with a different lender and to return a portion of the principal investment utilized in the acquisition of the Property. (Loan, ¶ 2.2(a).)

/ / /

b. $15,547,505, the "Holdback", was to be retained by the Lender and used for the costs and expenses incurred in improving the Property. (Loan, ¶ 2.2(b).)

c. $3,796,010, the "Accrued Interest Reserve," was to be retained by the Lender and applied to the payment of monthly interest. (Loan, ¶ 2.2(b).)

4. The $15,547,505 "Holdback" was allocated as follows:

a. $12,094,505 for the "Construction Costs Holdback," consisting of:

(1) $6,400,000 for renovating the Apartments on Parcel 1;

(2) $3,204,095 for renovating the Creative Office on Parcel 2;

(3) $960,410 for contingencies;

(4) $390,000 for construction management; and

(5) $1,140,000 for Tenant Improvements.

b. $2,703,000 for the "Soft Costs Holdback," consisting of:

(1) $228,000 for real estate taxes;

(2) $370,000 for insurance;

(3) $720,000 for permits;

(4) $280,000 for marketing;

(5) $605,000 for miscellaneous soft costs; and

(6) $500,000 for leasing commissions.

c. $750,000 for the "Development Fee" holdback.

5. GE Business Financial Services, Inc., a Delaware corporation ("GE"), acquired the Loan as part of its acquisition of Merrill's business assets. The Loan is currently scheduled to mature on August 31, 2010. The outstanding principal balance of the Loan is $32,098,059.47. Thus, the sum of $8,412,284.53 remains undisbursed. The last draw request was funded by GE on September 4, 2008. Further, draw requests submitted to GE on September 22 and October 23, 2008 and January 9 and March 10,

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

2009 were not funded. GE's breach of its funding requirements under the Loan is set forth in the Lender Liability Suit, and below.

6. Under the Loan, any amounts allocated to one category of funding could be allocated to another category by the Borrower with the approval of the Lender which could "not be unreasonably withheld, conditioned or delayed." (Loan, ¶ 2.2(b).)

**B. The Performance and Completion Guaranty**

In connection with the Loan, the Debtor and Borrower's managing member executed a document entitled "Performance and Completion Guaranty" (hereinafter referred to as the "Completion Guaranty"). A true and correct copy of the Completion Guaranty is attached hereto as Exhibit 3. A completion guaranty is an agreement by which the "guarantor covenants to complete the development project's 'improvements' should the borrower default, abandon construction, or fail to complete the project within the maximum time agreed upon in the construction loan." Comment: Issues in the Enforcement of Carry Guarantees and Completion Guarantees: Anti-Deficiency Rules, Surety Statutes, and Common Law, Sung, 3 UCLA L. Rev. 225, at 226 (hereinafter referred to as the "Sung Article").[2]

Under the Completion Guaranty, the Debtor's obligations were limited to the following:

> (1) ". . . the full, complete and punctual observance, performance, and satisfaction of all of the obligations, duties, covenants, and agreements of Borrower under the Loan Agreement and the other Loan Documents ***with respect to the construction and completion of the Project*** . . ." (emphasis added)
>
> (2) ". . . Borrower's obligation to keep the loan in balance . . .and the full and prompt payment of any deficiency amounts . . ."

---

[2] A true and correct copy of the Sung Article is attached hereto as Exhibit 4 for ease of the Court's reference.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

(3) ". . . the full and prompt payment of any Enforcement Costs . . ."

The Completion Guaranty is limited to these obligations. Section 5 of the Completion Guaranty expressly provides that: "This is an absolute, present and continuing guaranty of performance and completion and not of collection." As such, there is no agreement to pay the principal balance of the Loan, to pay for property taxes, or accrued and accruing interest. The Debtor expressly did not execute a recourse guaranty or a carry guaranty in connection with the Loan.[3]

**C. GE's Proof of Claim**

GE filed a proof of claim in the Debtor's case on or about December 22, 2009. The Proof of Claim was docketed as Claim Number 25-1. A copy of the Proof of Claim and Attachment 1 to the Claim are attached hereto collectively as Exhibit 5. Due to the length of the exhibits, and because certain exhibits are separately attached to this Motion, the Debtor has intentionally omitted the Proof of Claim exhibits. In Attachment 1 to the Claim, GE cites to the Guaranty language. It also asserts certain defaults under the Loan by the Borrower, which the Debtor vehemently denies, and which are the subject of the Borrower's Lender Liability Lawsuit. As stated in this suit, GE manufactured and alleged nonmonetary breaches in an effort to escape funding the completion of the Project, including the payment of vendors who already had performed services at the Project. The failure to make funds available to pay for such services, despite having the funds earmarked and available under the Loan to do so, resulted directly in the recording of more than 30 mechanic's liens. GE then disingenuously asserts that the existence of those mechanic's liens, which arose directly and unquestionably as a result of GE's wrongful failure to fund, constitute an additional

[3] A "carry guaranty" is an agreement by the guarantor to pay interest, property taxes, insurance, and maintenance and operation costs if the Borrower defaults. *Sung Article*, p. 226. No such guaranty was executed in connection with the Loan.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

default of the Borrower, and now seeks to collect these sums from the Debtor under the Completion Guaranty. Finally, GE asserts that based on the alleged defaults of the Borrower, the Debtor is liable not only for the alleged construction costs (which GE failed to fund), and enforcement costs, but also for the entire principal amount of the Loan, all accrued interest, and property taxes. *See* Attachment 1.

**D. Construction Status and GE's Breach of Funding Requirements**

The allegations relating to GE's wrongful breach of its funding obligations are set forth in detail in the Lender Liability Lawsuit attached hereto as Exhibit 1, and are incorporated herein by this reference. In response to GE's claim, the Debtor and Borrower allege as follows:

1. In September 2008, GE sent Borrower a letter claiming that Borrower was in default under the loan based upon its failure to: (a) complete the construction of the Apartments by July 31, 2008; (b) commence the renovation of the Creative Office by August 31, 2008; and (c) enter into a Sign Management Agreement and deliver a collateral assignment of the same to GE by May 30, 2008. The Temporary Certificate of Occupancy ("TCO") was obtained by Borrower for the Apartments on December 18, 2008. GE was at all times kept informed of the progress regarding the same and had its own onsite inspector regularly visiting the Project. The delay in obtaining the Certificate of Occupancy, was, and is, directly due to the GE's failure to honor its funding obligations under the Loan since early September 2008.

2. The renovation of the Creative Office was commenced in April 2008. In that month the Borrower commenced the demolition work on the improvements. Other than the demolition permit, no further permit was required to complete the renovation of the Creative Office. As described herein, the delay in proceeding with the work was the direct result of GE's wrongful failure to honor its funding obligations.

3. A Sign Management Agreement was executed on October 28, 2008, and a copy was provided to GE. The collateral assignment of the agreement was sent to the parties for signature on many occasions but was not returned, and GE was informed

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

of this fact. However, when the original loan was executed, a blanket assignment of all such documents, current and future, was executed by Borrower in favor of GE, which would also cover this document.

4. In September 2008 a contract was entered into with E&R Construction & Management, Inc. ("E&R") for the construction of the Creative Office. The contract price was $4,167,500.93 and included both the renovation and tenant improvement work. The executed E&R contract was delivered to GE. In October 2008, GE sent Borrower a letter claiming that it was in default because the Loan was now mysteriously "out of balance." GE claimed that only $2,985,706.88 remained in the budget for "Office Renovation Cost." Thus, according to GE, the E&R contract created a shortfall of $1,257,057. This sum was demanded to be funded by Borrower to "cure" the alleged default.

5. Discussions were had with GE regarding certain line item savings which could be reallocated to the Creative Office costs. Further, various discussions were had regarding the interpretation of the "cost to finish" the Creative Office contained in the Loan Agreement. GE was disingenuously estimating these costs based upon a Class "A" office building and not creative office the cost of which is much less than the Class "A" standard. GE consciously ignored this fact.

6. In October 2008, a revised agreement was entered into between Borrower and E&R to address GE's concerns regarding the renovation and finish costs for the Creative Office and costs of tenant improvements. The costs of tenant improvements were removed from the budget since it was agreed that such costs would only be incurred when and as tenants were secured for each portion of the Creative Office space. The contract price under the revised agreement was $3,633,856.73. This contract was delivered to GE for review and approval. Such approval was not provided and the original contract was reinstated.

7. After reallocating certain line items to reflect cost savings, GE revised its claim that the Loan out-of-balance downward to $794,722.61. A copy of GE's

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

letter is attached hereto as Exhibit 6. GE demanded that this amount be paid to it in order to bring the Loan into "balance" although, even if correct in its calculations such funds would not be due until the very end of the construction. It further stated that funding of the construction under the Loan Agreement would not recommence until this payment was made. Borrower did not agree with the assumptions, assertions and assessments utilized by GE in arriving at its number. However, the choice it faced was to either pay the erroneous out-of-balance amount or face foreclosure and/or other remedies by GE. Again, it should be noted that the Loan budget expressly contained a $320,000 hard cost contingency which GE refused to apply against the "out-of-balance" claim, although this was the very purpose for establishing this contingency.

8. GE refused to alter its position regarding the amount of the alleged shortfall even though, as was explained by Borrower and acknowledged by GE, the amount of any shortfall would only be determined at the end of the project if sufficient funds were not available to complete the Project. Thus, there simply was not, nor could there be, any current shortfall. GE already had the security of the Completion Guaranty to address its concern. However, it demanded additional protections not contemplated by the Loan Documents. GE demanded a letter of credit from the Borrower in the amount of its alleged out-of-balance amount. If the Borrower were to provide the letter of credit it was always discussed, understood and agreed that the same would function as security for the Completion Guaranty — it would operate only on the back-end of the completion of construction if needed. After much discussion, the parties agreed that a loan modification agreement would be entered into for the Loan (the "Modification").

9. Again, funding by GE ceased in early September 2008. Borrower sought the resumption of funding for more than four months. After this period, and in January 2009, a letter of intent was entered into regarding the Modification. Borrower was at all times led to believe that necessary approval by GE would be perfunctory and could be accomplished in a matter of days. Relying on this and other representations Borrower, in good faith, was requested to and did pay the interest due under the Loan for

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

the months of December and January, <u>even though the Loan had an interest reserve established solely for this purpose</u>. However, GE refused to draw on this reserve or to process the Modification unless and until such additional cash payments were made by Borrower. It was agreed that any letter of credit given in connection with the Modification would be reduced by these interest payments.

10. Borrower was informed by counsel for GE that the Modification was approved on March 4, 2009. However, the actual document was not received until March 10, 2009. The document provided for a full release of any and all claims against GE by the Borrower, which had not been discussed previously. This was troubling in light of GE's prior course of conduct regarding the Loan. Specifically, Borrower was concerned that if it executed the Modification fully releasing GE while being left with a Project that was devastated by the wrongful seven-month lack of funding, GE would simply proceed to again claim another group of manufactured nonmonetary defaults or covenant breaches under the Loan. It was viewed that the Modification had become a mechanism for GE to obtain a release and additional collateral for the Loan in the form of the letter of credit. The Modification altered the terms of the letter of credit. The Modification failed to provide that the letter of credit was to function as back-end security for the Completion Guaranty as was agreed. Rather, under the Modification the letter of credit was to be treated as additional collateral which could be realized upon in the event of an alleged breach of the Loan. This was never agreed to or even contemplated and served only to reinforce the Borrower's concerns about the post-Modification default claims intended by GE in order to realize on the additional collateral (i.e., the letter of credit).

11. Borrower supplied GE with comments to the Modification. The comments were made to conform the agreement which had been negotiated by and between the Borrower and GE. Discussions were had with counsel for GE during which the Borrower's concerns were frankly conveyed. Following such discussions GE's counsel requested that the Borrower confirm its understanding of the agreement between the parties relating to the Modification be delivered in the form of a memorandum. This

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

was immediately done only to be summarily rejected by GE.

12. It became clear to the Debtor that GE's actions to financially strangle the Project, claim nonmonetary breaches in an attempt to take the Project back were a direct reaction to the Lehman Brother bankruptcy filing. As was the case with the other projects in which Debtor was involved, an affiliate of Lehman was the Borrower's equity partner in this Project. Lehman filed for bankruptcy protection in September 2008. Just days after this filing GE summarily ceased funding and made the unsubstantiated claims of the covenant breaches. It was clear that in light of the economic environment, GE simply desired to keep all money "home" and to disburse no further funds. It must be remembered that no monetary default on the part of Borrower occurred until after GE ceased funding.

13. There was a complete lack of funding for a period of eight months. As a result, many liens were recorded against the Project, and over 30 suits commenced to foreclose on such liens, which the Borrower has been left to defend. At the time GE made the claim of default, the construction of the Apartments was virtually complete. All that remained to be done was some standard pick-up work and the passage of the test of the fire safety control system for the units. However, the general contractor for the Apartments failed to cooperate in the testing and even took steps to interfere with the passage of the fire safety control system due to the fact that it had not been paid as a result of GE's failure to honor valid draw requests. E&R walked off the job after having filed its lien. It subsequently went out of business and has filed its own chapter 7 bankruptcy case, reportedly as a direct result of not being paid for the Project.[4]

14. Had GE honored its funding obligations, the lease up of the Apartments could have commenced in a timely manner and would by now be complete or substantially complete. Likewise, the Creative Office would have been completed and

---

[4] Attached hereto as Exhibit 7 is a true and correct copy of E&R's bankruptcy petition and schedules.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

lease up begun. Further, there is commercial signage on the Project which could have been leased up and generating revenue had the Project been funded to completion.

**E. Status of Pending Lender Liability Lawsuit**

E&R filed a lawsuit against the Borrower, LB/Lakeside Capital Partners, LLC, and the Debtor for failure to pay amounts claimed as owing under its contract. The Debtor and Borrower answered the lawsuit, and the Borrower filed a cross-complaint against GE and Merrill based upon their conduct with regard to the Loan (the "Lender Liability Suit"). The Lender Liability Suit seeks damages for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with contract, intentional interference with business expectancy, unjust enrichment, declaratory relief, and indemnity. As stated above, there were 31 (now consolidated) suits filed by holders of mechanic's liens. There is a mediation scheduled in the Lender Liability Lawsuit for May 6, 2010, and a global mediation scheduled in the now-consolidated mechanic's lien actions for April 20, 2010.

**II.**

**OBJECTION TO CLAIM**

**A. The Court Must Eliminate From GE's Claim All Amounts Sought for Principal, Interest and Property Taxes**

While the entire amount of GE's proof of claim should be disallowed, GE's attempt to recover the principal amount of the Loan, accrued interest and property taxes must be eliminated as a matter of law because there is no basis under the operative Completion Guaranty to impose such a liability on the Debtor. GE's claim is in the amount of $42,705,475.63 and includes amounts for loan principal, late charges, accrued interest, "in balance" payment, real property taxes and amount required to resolve the mechanic's liens. They claim, without contractual or legal basis, that the Debtor is obligated to pay such sums pursuant to the terms of his Completion Guaranty. The foregoing claims are those one might expect to see if the claim were based upon a "recourse", "payment" or "collection guarantee." But, such a guaranty was not executed

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

in connection with the Loan.

As the title of the document itself suggest, the obligations guaranteed by the Debtor under the Completion Guaranty, are expressly limited. The Debtor is obligated only to guaranty the lien-free completion of the construction of the improvements of the Project.

The obligations under the guaranty are set forth as follows:

> (1) ". . . the full, complete and punctual observance, performance, and satisfaction of all of the obligations, duties, covenants, and agreements of Borrower under the Loan Agreement and the other Loan Documents ***with respect to the construction and completion of the Project*** . . . (emphasis added)"
>
> (2) ". . . Borrower's obligation to keep the loan in balance . . .and the full and prompt payment of any deficiency amounts . . ."
>
> (3) ". . . the full and prompt payment of any Enforcement Costs . . ."

The Guaranty is limited to these obligations. Section 5 of the Completion Guaranty expressly provides that: "This is an absolute, present and continuing guaranty of performance and completion and not of collection." The Debtor is thus, in no way liable for any loan principal, late charges, accrued interest, or real property taxes. In the attachment to the Proof of Claim, GE points to no provision in the Completion Guaranty under which the Debtor agreed to answer for such sums under the Loan. The Debtor only guaranteed the Borrower's completion of the project. **Nothing else**. (Note once again that the Apartments have been fully completed.)

It is imperative that the Court rule that this portion of the claim must be eliminated as a matter of law, as the existence of such an inflated claim grossly distorts the pool of unsecured claims for which the Debtor must account in proposing and confirming his plan of reorganization. Where there is no contractual basis for the liability, the requested ruling of this court is both appropriate and necessary to eliminate it from the claims docket.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**B. GE May Not Recover for Completion Costs Because its Breach Caused the Defaults it Now Claims**

As stated above, and in greater detail in the Lender Liability Lawsuit, GE's wrongful failure to fund loan amounts based upon the approved budget for the Project resulting directly in the recording of the mechanic's liens against the Project, as well as, the inability of the Borrower to complete the Creative Office portion of the Project. The Apartments were completed despite the lack of funding by GE. It is axiomatic that GE cannot cause the breach under the Loan and then seek to recover damages for such breach from the Guarantor. This violates the basic maxim of jurisprudence that "no one can take advantage of his own wrong." Cal Civ. Code § 3517. Therefore, in order to succeed on its claim against the Debtor for enforcement costs, the obligation to keep the loan in balance and to satisfy the mechanic's liens, the Court must make a finding that GE's breach did not cause or contribute to the asserted breaches by the Debtor. The facts set forth described herein, and in the Lender Liability Lawsuit, unequivocally demonstrate that no such finding is possible.

GE manufactured nonmonetary breaches under the Loan in a calculated effort to escape its obligation liability to fund the completion of the Project. GE was not within its rights to stop funding based upon these alleged defaults. There was a procedure set forth in ¶ 8.1(c) of the Loan Agreement to address nonmonetary defaults. Under this procedure, if the Borrower failed "to observe or perform a nonmonetary covenant or condition contained in the Agreement or any other Loan Documents", the lender must give written notice of same. The failure to perform a nonmonetary covenant or condition may be cured. Section 8.1(c) specifically provides that:

> "Failure of borrower for a period of 30 days after written notice from Lender, to observe or perform any nonmonetary covenant or condition contained in this Agreement or any other Loan Documents not set forth in the subsections above; provided that if the Lender determines any such failure concerning a nonmonetary covenant or condition is susceptible to cure and cannot reasonably be cured within said 30 day period, then Borrower shall have an additional 60 day period to cure such failure and no Event of Default shall

be deemed to exist hereunder so long as (i) borrower commences such cure within the initial 30 day period and diligently and in good faith pursues such a cure to completion within the resulting 90 day period from the date of the Lender's notice…." (Loan ¶ 8.1(c).)

Notwithstanding this procedure, GE refused to honor draw requests immediately after giving the notice of defaults. As demonstrated above, this resulted directly in the progress towards completion of the Creative Office ground to a halt, preventing the minor pick-up work at the Apartments, and caused the recordation of the mechanic's liens.

A condition precedent to the funding of the Apartment construction was receipt by the lender of very specific construction documents referred to as Apartment Construction Documents. (Loan ¶ 2.1(b)). However, there was no requirement that the Lender receive a similarly detailed set of construction documents for the Retail Improvements ("Retail Construction Documents") until the balance of the disbursements under the Loan reached $34,907,839. (Loan ¶2.2(d) and (d)(xiii)). Prior to that, Retail Improvements were made simply pursuant to the basic budget ("Budget") listed in Exhibit B to the Loan, of which the Retail Improvements comprised five entries beginning with "office" and included a share in the general Budget entries which have neither "office" nor "apt" listed in them.

The Loan contained a detailed timeline of a completion schedule for the Apartment renovation in Exhibit C to the Loan, but there was no timeline for completion of the Retail Improvements (*i.e.*, Creative Office). But, the only deadlines pertaining to the renovation of the Retail Improvements were that work "commence" by August 1, 2008, and be completed by July 31, 2009, unless delay in doing so was caused by events beyond the Borrower's control, in which case the deadline may be extended for a reasonable amount of time. (Loan, ¶ 4.1(m).)

The Loan contains a provision requiring that the Borrower keep the loan "In Balance," the failure of which could lead to a nonmonetary default. Section 4.1(l) of the Loan Agreement provided in pertinent part as follows:

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

"Borrower shall keep the Loan "In Balance" at all times prior to Completion. The Loan is "In Balance" when the remaining undisbursed proceeds of the Loan (including amounts necessary to pay any retainage), together with any deposits previously made by the Borrower and held by the Lender, are sufficient to achieve Completion of the Improvements in accordance with the Construction Budget, Construction Documents, and Change Orders permitted by Agreement...."

(Loan, ¶ 4.1(l).)

In summary, GE was obligated to fund the draw requests unless it provided Borrower with a report detailing which portions were problematic. Even then GE had the obligation to funds all other portions of the construction Failure by the Borrower to comply with nonmonetary covenants and conditions could not become an event of default for at least 90 days following notice provided the Borrower worked in good faith to remedy them. There was no bar on applying the interest reserve to making interest payments. The only details in the Loan that pertained to the Retail Improvements were a start date and an end date and 5 line item entries on the Budget attached as Exhibit B to the Loan Agreement. The "In Balance" calculation compares the Budget and the Apartment and Retail Construction Documents on the one hand, with the funds remaining on the Loan on the other hand to determine whether there are funds sufficient on the Loan to complete the project consistent with the Budget and approved Construction Documents. There was no obligation on the Borrower to provide detailed Retail Construction documents until the Loan Balance reached approximately $35,000,000 (which never occurred).

In short, GE breached its funding obligations under the Loan, without justification or authority. This breach resulting in the recording of the mechanic's liens and the resulting litigation. It frustrated the Borrower ability l to complete the Creative Office and Retail Space. GE cannot prevent the Borrower from completing the Project, then be permitted to assert a claim against the Debtor under the Completion Guaranty. As such, GE's claim must be disallowed in its entirety.

/ / /

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

## III.

## CONCLUSION

For all the reasons set forth herein, the Debtor respectfully requests that the Court enter an order:

1. Granting the Motion in its entirety;

2. Finding, adjudging and decreeing that the Debtor has no liability under the express and unequivocal terms of the Completion Guaranty with respect the principal amount of the underlying loan, late charges, accrued interest, or real property taxes;

3. With respect to the Debtor's guaranty of the completion of the construction of the project (the "Completion Guaranty Obligations"), that the Debtor's performance was excused by GE's wrongful failure to fund the project; and

4. Granting such other and further relief as the Court deems just and proper.

DATED: April 16, 2010

Respectfully submitted,

**Sulmeyer**Kupetz
A Professional Corporation

By: */s/ Mark S. Horoupian*
Victor A. Sahn
Attorneys for David Schwartzman, Debtor in Possession

# DECLARATION

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

**DECLARATION OF DAVID SCHWARTZMAN**

I, DAVID SCHWARTZMAN, declare as follows:

1. I am a party in the above-entitled action. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2. I am the majority interest holder and the Managing Member of DS Ventures, LLC ("DS Ventures") and DMB Ventures, LLC ("DMB"). I have more than eighteen (18) years of real estate experience. I began my real estate development career in California in 1990 with the acquisition and entitlement of land and the construction of single family homes. In 1993, I founded Patriot Homes, LLC ("Patriot"). Patriot and its related and affiliated entities operated a dynamic real estate development business which successfully acquired, entitled, and permitted properties on which it constructed thousands of single family homes, condominiums and planned unit developments or PUDs. In 1999, I founded DS to concentrate on land acquisition and entitlement projects, as well as the acquisition and development of residential and commercial real property in Central and Southern California. To date, I have acquired developed and/or improved several hundred million dollars worth of real estate. Presently, DS and DMB owns or controls over 1,500 lots and units located throughout Central and Southern California, in the counties of Santa Barbara, Los Angeles, Fresno and Kern.

3. LB/L-DS Ventures Metropolitan II, LLC, a Delaware limited liability company (the "Borrower"), is the owner of that certain real property located in Hollywood, California (the "Project"). I am the managing member of DS Ventures, LLC, which is a shareholder in LB/L DS Ventures II Master, LLC, the sole shareholder of the Borrower. The Project consists of three components: a 12-story tower containing 52 apartment units (the "Apartments"); a two-story building containing approximately 38,000 square feet of commercial creative office space (the "Creative Office"); and an adjacent lot, which is entitled for the construction of 79 apartment units (the "Lot"). In addition, the Project is

approved for the placement of two large commercial signs.

4. Merrill Lynch Capital ("Merrill") was the original lender on the Project. On or about August 2, 2007 Merrill loaned Borrower the sum of $40,510,344 (the "Loan") in order to develop the project. The Loan was evidenced by a note executed in favor of Merrill and secured by deed of trust on the Project, and a Loan Agreement. A true and correct copy of the Loan Agreement is attached hereto as Exhibit 2. LB/L-DS Ventures II Master, LLC, a Delaware limited liability company ("Master 2") and I executed a Performance and Completion Guaranty (the "Completion Guaranty") in favor of Merrill in connection with the Loan. A true and correct copy of the Completion Guaranty is attached hereto as Exhibit 3.

5. Under the express terms of the Loan, Merrill was to disburse the proceeds as follows:

a. $21,166,829, the "Closing Funding Amount," was to be used to pay off the Property acquisition loan then in place with a different lender and to return a portion of the principal investment utilized in the acquisition of the Property. (Loan, ¶ 2.2(a).)

b. $15,547,505, the "Holdback," was to be retained by the Lender and used for the costs and expenses incurred in improving the Property. (Loan, ¶ 2.2(b).)

c. $3,796,010, the "Accrued Interest Reserve," was to be retained by the Lender and applied to the payment of monthly interest. (Loan, ¶ 2.2(b).)

6. The $15,547,505 "Holdback" was allocated as follows:

a. $12,094,505 for the "Construction Costs Holdback," consisting of:

(1) $6,400,000 for renovating the Apartments on Parcel 1;

(2) $3,204,095 for renovating the Creative Office on Parcel 2;

(3) $960,410 for contingencies;

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

(4) $390,000 for construction management; and

(5) $1,140,000 for Tenant Improvements.

b. $2,703,000 for the "Soft Costs Holdback," consisting of:

(1) $228,000 for real estate taxes;

(2) $370,000 for insurance;

(3) $720,000 for permits;

(4) $280,000 for marketing;

(5) $605,000 for miscellaneous soft costs; and

(6) $500,000 for leasing commissions.

c. $750,000 for the "Development Fee" holdback.

7. It is my understanding that GE Business Financial Services, Inc., a Delaware corporation ("GE") acquired the Loan as part of its acquisition of Merrill's business assets. The Loan is currently scheduled to mature on August 31, 2010. The outstanding principal balance of the Loan is $32,098,059.47. Thus, the sum of $8,412,284.53 remains undisbursed. The last draw request was funded by GE on September 4, 2008. Further, draw requests submitted to GE on September 22 and October 23, 2008 and January 9 and March 10, 2009 were not funded. GE's breach of its funding requirements under the Loan is set forth in the Lender Liability Suit, and below.

8. I expressly did not execute a recourse guaranty or a carry guaranty in connection with the Loan.

9. In September 2008, GE sent Borrower a letter claiming that Borrower was in default under the loan based upon its failure to: (a) complete the construction of the Apartments by July 31, 2008; (b) commence the renovation of the Creative Office by August 31, 2008; and (c) enter into a Sign Management Agreement and deliver a collateral assignment of the same to GE by May 30, 2008. The Temporary Certificate of Occupancy ("TCO") was obtained by Borrower for the Apartments on December 18, 2008. GE was at all times kept informed of the progress regarding the same and had its

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

own onsite inspector regularly visiting the Project. The delay in obtaining the Certificate of Occupancy, was, and is, directly due to the GE's failure to honor its funding obligations under the Loan since early September 2008.

10. The renovation of the Creative Office was commenced in April 2008. In that month the Borrower commenced the demolition work on the improvements. Other than the demolition permit, no further permit was required to complete the renovation of the Creative Office. As described herein, the delay in proceeding with the work was the direct result of GE's wrongful failure to honor its funding obligations.

11. A Sign Management Agreement was executed on October 28, 2008 and a copy was provided to GE. The collateral assignment of the agreement was sent to the parties for signature on many occasions but was not returned, and GE was informed of this fact. However, when the original loan was executed, a blanket assignment of all such documents, current and future, was executed by Borrower in favor of GE, which would also cover this document.

12. In September 2008 a contract was entered into with E&R Construction & Management, Inc. ("E&R") for the construction of the Creative Office. The contract price was $4,167,500.93 and included both the renovation and finish work. The executed E&R contract was delivered to GE. In October 2008, GE sent Borrower a letter claiming that it was in default because the Loan was now mysteriously "out-of-balance." GE claimed that only $2,985,706.88 remained in the budget for "Office Renovation Cost." Thus, according to GE, the E&R contract created a shortfall of $1,257,057. This sum was demanded to be funded by Borrower to "cure" the alleged default.

13. I participated in discussions with GE regarding certain line item savings which could be reallocated to the Creative Office costs. Further, various discussions were had regarding the interpretation of the "cost to finish" the Creative Office contained in the Loan Agreement. GE was estimating these costs based upon a Class "A" office building and not creative office the cost of which is much less than the Class "A" standard.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

14. In October 2008, a revised agreement was entered into between Borrower and E&R to address GE's concerns regarding the renovation and finish costs for the Creative Office and costs of tenant improvements. The costs of tenant improvements were removed from the budget since it was agreed that such costs would only be incurred when and as tenants were secured for each portion of the Creative Office space. The contract price under the revised agreement was $3,633,856.73. This contract was delivered to GE for review and approval. Such approval was not provided and the original contract was reinstated.

15. After reallocating certain line items to reflect cost savings, GE revised its claim that the Loan out of balance downward to $794,722.61. A copy of GE's letter is attached hereto as Exhibit 6. GE demanded that this amount be paid to it in order to bring the Loan into "balance" although, even if correct in its calculations such funds would not be due until the very end of the construction. It further stated that funding of the construction under the Loan Agreement would not recommence until this payment was made. We did not agree with the assumptions, assertions and assessments utilized by GE in arriving at its number. However, the choice we faced was to either pay the erroneous out-of-balance amount or face foreclosure and/or other remedies by GE. Again, it should be noted that the Loan budget expressly contained a $320,000 hard cost contingency which GE refused to apply against the "out-of-balance" claim, although this was the very purpose for establishing this contingency.

16. GE refused to alter its position regarding the amount of the alleged shortfall even though, as was explained by us and acknowledged by GE, the amount of any shortfall would only be determined at the end of the project if sufficient funds were not available to complete the Project. Thus, there simply was not, nor could there be, any current shortfall. GE already had the security of the Completion Guaranty to address its concern. However, it demanded additional protections not contemplated by the Loan Documents. GE demanded a letter of credit from the Borrower in the amount of its alleged out-of-balance amount. If the Borrower were to provide the letter of credit it

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

was always discussed, understood and agreed that the same would function as security for the Completion Guaranty — it would operate only on the back-end of the completion of construction if needed. After much discussion, the parties agreed that a loan modification agreement would be entered into for the Loan (the "Modification").

17. Again, funding by GE ceased in early September 2008. Borrower sought the resumption of funding for more than four months. After this period, and in January 2009, a letter of intent was entered into regarding the Modification. Borrower was at all times led to believe that necessary approval by GE would be perfunctory and could be accomplished in a matter of days. Relying on this and other representations Borrower, in good faith, was requested to and did pay the interest due under the Loan for the months of December and January, <u>even though the Loan had an interest reserve established solely for this purpose</u>. However, GE refused to draw on this reserve or to process the Modification unless and until such additional cash payments were made by Borrower. It was agreed that any letter of credit given in connection with the Modification would be reduced by the January interest payment.

18. We were informed by counsel for GE that the Modification was approved on March 4, 2009. However, the actual document was not received until March 10, 2009. The document provided for a full release of any and all claims against GE by the Borrower, which had not been discussed previously. This was troubling in light of GE's prior course of conduct regarding the Loan. Specifically, we were concerned that if it executed the Modification fully releasing GE while being left with a Project that was devastated by the wrongful seven-month lack of funding, GE would simply proceed to again claim another group of manufactured nonmonetary defaults or covenant breaches under the Loan. I believed that the Modification had become a mechanism for GE to obtain a release and additional collateral for the Loan in the form of the letter of credit. The Modification altered the terms of the letter of credit. The Modification failed to provide that the letter of credit was to function as back-end security for the Completion Guaranty as was agreed. Rather, under the Modification the letter of credit was to be treated as

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

additional collateral which could be realized upon in the event of an alleged breach of the Loan. This was never agreed to or even contemplated and served only to reinforce my concerns about the post-Modification default claims intended by GE in order to realize on the additional collateral (*i.e.*, the letter of credit).

19. Borrower supplied GE with comments to the Modification. The comments were made to conform the agreement which had been negotiated by and between the Borrower and GE. Discussions were had with counsel for GE during which the Borrower's concerns were frankly conveyed. Following such discussions GE's counsel requested that the Borrower confirm its understanding of the agreement between the parties relating to the Modification be delivered in the form of a memorandum. This was immediately done only to be summarily rejected by GE.

20. It became clear to me that GE's actions to financially strangle the Project, claim nonmonetary breaches in an attempt to take the Project back were a direct reaction to the Lehman Brother bankruptcy filing. As was the case with the other projects in which I was involved, an affiliate of Lehman was the Borrower's equity partner in this Project. Lehman filed for bankruptcy protection in September 2008. Just days after this filing GE summarily ceased funding and made the unsubstantiated claims of the covenant breaches.

21. There was a complete lack of funding for a period of eight months. As a result, many liens were recorded against the Project, and over 30 suits commenced to foreclose on such liens, which the Borrower has been left to defend. At the time GE made the claim of default, the construction of the Apartments was virtually complete. All that remained to be done was some standard pick-up work and the passage of the test of the fire safety control system for the units. However, the general contractor for the Apartments failed to cooperate in the testing and even took steps to interfere with the passage of the fire safety control system due to the fact that it had not been paid as a result of GE's failure to honor valid draw requests. E&R walked off the job after having filed its lien. It subsequently went out of business and has filed its own chapter 7

**Sulmeyer**Kupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520

bankruptcy case, reportedly as a direct result of not being paid for the Project.[5]

22. Had GE honored its funding obligations, the lease up of the Apartments could have commenced in a timely manner and would by now be complete or substantially complete. Likewise, the Creative Office would have been completed and lease up begun. Further, there is commercial signage on the Project which could have been leased up and generating revenue had the Project been funded to completion.

23. E&R filed a lawsuit against the Borrower, LB/Lakeside Capital Partners, LLC, and the Debtor for failure to pay amounts claimed as owing under its contract. Borrower and I answered the lawsuit, and the Borrower filed a cross-complaint against GE and Merrill based upon their conduct with regard to the Loan (the "Lender Liability Suit"). The Lender Liability Suit seeks damages for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with contract, intentional interference with business expectancy, unjust enrichment, declaratory relief, and indemnity. As stated above, there were 31 (now consolidated) suits filed by holders of mechanic's liens. There is a mediation scheduled in the Lender Liability Lawsuit for May 6, 2010, and a global mediation scheduled in the now-consolidated mechanic's lien actions for April 20, 2010.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 16, 2010, at Los Angeles, California.

DAVID SCHWARTZMAN

[5] Attached hereto as Exhibit 7 is a true and correct copy of E&R's bankruptcy petition and schedules.

SulmeyerKupetz, A Professional Corporation
333 SOUTH HOPE STREET, THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1406
TEL 213.626.2311 • FAX 213.629.4520